STERLING TRUST COMPANY,
Petitioner,

v.

Roderick ADDERLEY, et
al., Respondents.

No. 03–1001.

Supreme Court of Texas.

Argued Sept. 29, 2004.

Decided June 17, 2005.

Rehearing Denied Aug. 26, 2005.

Donald E. Herrmann, Dee J. Kelly, Todd W. Spake, John Thomas Wilson IV, Kelly Hart & Hallman, P.C., Fort Worth, Robert B. Gilbreath, V. Elizabeth Kellow, Alan R. Bromberg, Jenkens & Gilchrist, P.C., Dallas, Sharon E. Callaway, Crofts & Callaway, P.C., San Antonio, for Petitioner.

Rickey J. Brantley, David E. Keltner, Jose Henry Brantley & Keltner, L.L.P., Thomas G. Farrier, Murphy Mahon Keffler & Farrier, L.L.P., Fort Worth, James Dan Moorhead, Law Office of James Dan Moorhead, Arlington, for Respondents.

Karen Sue Neeley, Joseph R. Knight, Baker & Botts, L.L.P., Austin, Philip John Kuhl Jr., Sanford & Kuhl, N. Scott Fletcher, Houston, Royal B. Lea III, Bingham & Lea, P.C., San Antonio, for Amici Curiae.

Justice O'NEILL delivered the opinion of the Court.

The Texas Securities Act (TSA) imposes liability on a person who sells securities "by means of an untrue statement of a material fact or an omission to state a material fact," and imposes liability on a person who "materially aids a seller, buyer, or issuer of a security" if the person acts "with intent to deceive or defraud or with reckless disregard for the truth or the law." TEX. REV. CIV. STAT. ANN. ART. 581–33F(2) (Vernon Supp.2004–2005). The trial court and court of appeals interpreted the latter provision to allow aider liability even if the aider was unaware of its role in the securities violation. We conclude, however, that the TSA's requirement of "reckless disregard for the truth or the law" means that an alleged aider is subject to liability only if it rendered assistance to the seller in the face of a perceived risk that its assistance would facilitate untruthful or illegal activity by the primary violator. This standard does not mean that the aider must know of the exact misrepresentations or omissions made by the seller, but it does mean that the aider must be subjectively aware of the primary violator's improper activity. Accordingly, we reverse the court of appeals' judgment and remand this case to the trial court for further proceedings consistent with this opinion.

## I

During the early to mid–1990s, Norman Cornelius formed Avalon Custom Homes and a number of related corporate entities (collectively referred to as "Avalon") designed to develop and sell luxury homes. At that time, Cornelius worked as an investment advisor and broker for Sunpoint Securities. Cornelius operated Avalon out of his Sunpoint office and encouraged his brokerage clients to invest their money in Avalon. Cornelius also persuaded members of his church and retirees from Mrs. Baird's Bakery to invest in Avalon, offering investors promissory notes that bore as much as an eighteen percent rate of

return and allowed conversion to Avalon stock.

Many of the investors chose to invest their retirement savings in Avalon. Because certain retirement accounts such as IRAs and lump-sum pension distributions must be held by a third-party trustee to maintain their preferential tax status, Avalon needed a third-party trustee in order to accept such funds. In 1994, Cornelius began recommending that Avalon investors use Sterling Trust Company, a custodian of self-directed IRA accounts, as their IRA custodian. From 1994 until 1997, Sterling served as the exclusive trustee over the retirement money that the investors self-directed to Cornelius.

In 1997, the Securities and Exchange Commission (SEC) filed suit against Cornelius, alleging that Cornelius misrepresented the risks associated with the investments, misrepresented the uses of investment funds, and misrepresented the commingling and misappropriation of funds. Avalon was forced into receivership, and the Avalon investors collectively lost millions of dollars. A number of elderly investors lost their entire retirement savings. The investors sued Cornelius, Sunpoint Securities, Van Lewis (the owner of Sunpoint), and Sterling Trust. After suit was filed, but before the case was tried, Cornelius died and Sunpoint entered receivership. The claims against Sunpoint were severed from the suit as a result of the receivership, but Sunpoint was still included in the charge as a party to which the jury could apportion responsibility.

At trial, the investors put forth several theories of liability. The jury charge asked (1) whether each of the defendants offered or sold securities "by means of an untrue statement of material fact or the omission to state a material fact necessary in order to make the statements made, if any, in light of the circumstances under which they were made not misleading"; (2) whether Sterling aided Cornelius in committing securities fraud by "directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aid[ing] a seller of a security"; (3) whether Sterling was "part of a conspiracy that damaged [the investors]"; (4) whether Sterling "fail[ed] to comply with its fiduciary duty" to its account holders; and (5) whether the defendants committed fraud against the investors.

In support of these contentions, the investors provided evidence that Cornelius told investors that investing in Avalon carried "no risk" and that any principal invested would be protected. There was also evidence that Avalon was not profitable and that early investors were paid with the proceeds of later investors, thus creating a pyramid effect that collapsed when new investments dried up.[1]

The investors argued that Sterling played an essential role in allowing the investment scheme to continue as long as it did. They argued that Sterling had a duty to undertake a "suitability analysis" and that it should have informed the investors that "too much of their net worth" was held in "overly risky investments." The investors provided evidence that Sterling's failure to comply with several of its

---

1. This type of pyramid scheme is often referred to as a "Ponzi scheme," a term "derived from one Charles Ponzi, a famous Boston swindler. With a capital of $150, Ponzi began to borrow money on his own promissory notes at a 50% rate of interest payable in 90 days. Ponzi collected nearly $10 million in 8 months ... using the funds of new investors to pay off those whose notes had come due." *United States v. Shelton*, 669 F.2d 446, 449 n. 2 (7th Cir.1982).

own internal procedures facilitated Cornelius's pyramid scheme and allowed Cornelius to hide the nature of his scheme from the investors. For example, the investors showed that, although Sterling's policies prohibited it from holding promissory notes that were in default, it nevertheless held such notes. The investors also provided evidence that Sterling failed to obtain many of the Avalon stock certificates and original promissory notes; ordinarily, Sterling employees could not enter transactions into Sterling's computer system without such documents. When lower-level Sterling employees alerted management to the lack of such documents, they were told that Sterling had made an agreement allowing Avalon to retain those documents. There was also evidence that Sterling failed to obtain copies of the security agreements for the promissory notes that purported to be secured by real estate, even though Sterling's internal procedures required it to keep such documents on file. In addition, the investors provided evidence that Sterling was aware that Cornelius was commingling investors' funds by having one or more of the Avalon companies make payments on notes for which another Avalon company was indebted, and that at least one of Sterling's internal memos questioned this practice. Finally, the investors demonstrated that Cornelius did not pay the principal balance on a number of notes as they became due, but instead transferred the investors' money into new investment vehicles in other Avalon entities. There was evidence that Sterling allowed Cornelius to unilaterally make such transfers despite its own policy requiring documentation of investor approval for new investments.

The jury returned a verdict against Cornelius on all counts. On the issues pertaining to Sterling, however, the verdict was mixed. Specifically, the jury found that Sterling was not a "seller" of securities, that Sterling did not conspire to damage the investors, and that Sterling did not commit fraud. However, the jury found that Sterling aided Cornelius's securities violation and that Sterling breached its fiduciary duty to its account holders. The investors elected to recover on the aiding-and-abetting finding, and the trial court rendered judgment against Sterling for $6 million in actual damages and $250,000 in exemplary damages. The court of appeals affirmed the trial court's award of actual damages, but reversed the exemplary damages award. 119 S.W.3d 312. We granted Sterling's petition for review to consider the scope of its potential liability to the investors and related issues.

## II

The Texas Securities Act establishes both primary and secondary liability for securities violations. Primary liability arises when a person "offers or sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." TEX. REV. CIV. STAT. ANN. art. 581–33A(2) (Vernon Supp.2004–2005). Secondary liability is derivative liability for another person's securities violation; it can attach to either a control person, defined as "[a] person who directly or indirectly controls a seller, buyer, or issuer of a security," or to an aider, defined as one "who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security." *Id.* art. 581–33F(1)–(2). Both control persons and aiders are jointly and severally liable with the primary violator "to the same extent as if [they] were" the primary violator. *Id.*

In this case, the jury found that Sterling was secondarily liable as an aider. Sterling argues that the trial court erred by failing to instruct the jury that an alleged aider cannot be held secondarily liable unless it had a "general awareness" of its role in the primary violation. *See Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex.App.-Houston [14th Dist.] 2000, pet. denied) (holding that "[i]n order to establish liability" for aiding a securities violation, "a plaintiff must demonstrate ... that the alleged aider had 'general awareness' of its role in this violation") (citations omitted). At the charge conference, Sterling objected to the trial court's proposed instruction on aider liability because it made no mention of the "general awareness" requirement. The trial court overruled this objection. The court of appeals held that the failure to include such an instruction was not error, concluding that "the TSA does not require proof that an aider is generally aware of its role in the securities violation to be liable as an aider." 119 S.W.3d at 320. Sterling contends the court of appeals' holding conflicts with opinions from other Texas courts of appeals that have held that the TSA does impose such a requirement. *See Goldstein v. Mortenson*, 113 S.W.3d 769, 776 (Tex. App.-Austin 2003, no pet.); *Crescendo Invs., Inc. v. Brice*, 61 S.W.3d 465, 472 (Tex.App.-San Antonio 2001, pet. denied); *Bear, Stearns & Co.*, 11 S.W.3d at 384. In this case, the court of appeals noted the conflict but concluded that, because the "language of the TSA" does not explicitly impose such a requirement, the proper course was to "decline to follow those opinions ... that have concluded that the TSA contains a general awareness requirement." 119 S.W.3d at 319–20.

■ We disagree with the court of appeals' conclusion that the TSA contains no awareness requirement. The statute's history demonstrates that the Legislature intended the TSA to be interpreted in harmony with federal securities law, and the TSA itself instructs that "[t]his Act may be construed and implemented to effectuate its general purpose to maximize coordination with federal and other states' law and administration." TEX. REV. CIV. STAT. ANN. art. 581–10–1A (Vernon Supp. 2004–2005). When the Legislature added the aider-liability provision to the TSA in 1977, most federal courts considering the issue had held that aider liability could be imposed under the federal securities law only when the aider was generally aware of its role in an improper scheme.[2] *See Gould v. American–Hawaiian S.S. Co.*, 535 F.2d 761, 779–80 (3d Cir.1976) (stating that "[t]he required knowledge of the act has been defined as a 'general awareness (on the part of the aider and abettor) that his role was part of an overall activity that is improper'" and that "the proof offered must establish conscious involvement in impropriety or constructive notice of intended impropriety") (quoting *SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir.1974)); *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 96 (5th Cir.1975) ("The postman who mails a fraudulent letter is not covered by the Act, nor is the company that

---

**2.** The United States Supreme Court later held that Congress did not intend to create a private cause of action for aiding and abetting a securities violation under section 10(b) of the Securities Exchange Act. *Cent. Bank of Denver v. First Interstate Bank of Denver*, 511 U.S. 164, 191, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994). However, that decision does not affect the SEC's ability to impose penalties

against parties who have "willfully aided" another's violation of the securities laws. 15 U.S.C. § 78u–2(a)(2). Such SEC actions still require " 'a general awareness by the aider and abettor that his role was part of an activity that was improper.'" *Howard v. Sec. & Exch. Comm'n*, 376 F.3d 1136, 1142 (D.C.Cir. 2004) (citations omitted).

manufactured the paper on which the violating documents are printed.... [T]he proof must demonstrate actual awareness[3] of the party's role in the fraudulent scheme.") (citations omitted).

The investors argue that the federal cases are irrelevant because the Texas Legislature chose a different, lesser standard for aider liability under the TSA; specifically, the investors point out that liability may be imposed on an aider who acted "with intent to ... defraud or with reckless disregard for the truth or the law," and argue that "reckless disregard" may be shown even if the aider had no awareness of its role in an improper scheme. *See* TEX. REV. CIV. STAT. ANN. art. 581–33F(2). As support for this proposition, the investors point to a Texas court of appeals case which held that a "failure to conduct minimal investigation and inquiry" before rendering assistance with a securities transaction can suffice to create liability under the "reckless disregard" standard. *See Goldstein,* 113 S.W.3d at 777.

■ We disagree that the "reckless disregard" standard either imposes a lesser standard than the "general awareness" requirement or allows liability to be imposed for a mere failure to investigate. Instead, we conclude that the statute's use of the phrase "reckless disregard for the truth or the law" accords with the requirement that an aider must be aware of the primary violator's improper activities before it may be held liable for assisting in the securities violation. The Legislature's use of the phrase "reckless disregard" is consistent with a requirement of subjective awareness; at the time that the Legislature enacted the TSA, this Court had long held that "recklessness" required evidence of "conscious indifference" in the context of gross negligence. *See Rowan v. Allen,* 134 Tex. 215, 134 S.W.2d 1022, 1025 (1940) (holding that "reckless disregard of the rights of [the] plaintiff" means "a conscious indifference to her rights or welfare"). The United States Supreme Court has noted a number of other civil actions in which recklessness requires a subjective awareness of, and indifference to, the risk posed by the defendant's conduct. *See Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 535, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999). In *Kolstad,* the Court stated that "recklessness in its subjective form" requires "a 'subjective consciousness' of a risk of injury or illegality and a 'criminal indifference to civil obligations.'" *Id.* at 536, 119 S.Ct. 2118. The Court noted that "recklessness in its subjective form" has been applied to the recovery of punitive damages in certain civil-rights actions and has also been applied in defamation cases, which require "knowledge of falsity or reckless disregard

---

**3.** The Fifth Circuit has clarified that its use of the term "actual awareness" did not encompass a different standard than the term "general awareness." *Abell v. Potomac Ins. Co.,* 858 F.2d 1104, 1126 (5th Cir.1988) ("In *Woodward,* we explained what these scienter requirements mean. 'General awareness,' we said, means knowledge which, though it may be adduced from reckless conduct, means actual awareness.") (citing *Woodward,* 522 F.2d at 96). Federal courts have typically used the term "general awareness" as a shorthand to describe actual awareness of general wrongdoing. *See, e.g., Investors Research Corp. v. Sec. & Exch. Comm'n,* 628 F.2d 168, 178 (D.C.Cir.1980) (noting that the SEC "failed to consider whether Driehaus had a general awareness that he was assisting Stowers in wrongful conduct"); *see also K & S P'ship v. Cont'l Bank, N.A.,* 952 F.2d 971, 977 (8th Cir.1991) ("[A] defendant's general awareness of its overall role in the primary violator's illegal scheme is sufficient knowledge for aiding and abetting liability.... If an illegal scheme exists and a bank's loan assists in that scheme, the bank's knowledge of the scheme is the crucial element that prevents it from suffering automatic liability for the conduct of insiders to whom it loaned the money.").

for the truth," *id.*, a requirement that has been interpreted to mean that the defendant "in fact entertained serious doubts as to the truth of his publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 20 L.Ed.2d 262 (1968). In *Kolstad*, the Court applied this subjective standard to the award of punitive damages in certain employment discrimination actions, holding that the statute's "reckless indifference" requirement meant that "an employer must at least discriminate in the face of a *perceived risk* that its actions will violate federal law to be liable in punitive damages." *Kolstad*, 527 U.S. at 536, 119 S.Ct. 2118 (emphasis added).

We conclude that the TSA's scienter requirement of "reckless disregard for the truth or the law" is similarly intended to impose a requirement of "recklessness in its subjective form," and this recklessness must be directly related to the primary violator's securities violation. *Id.* When the Texas Legislature adopted the aider provision of the TSA, it explicitly stated that aider liability should be imposed "only if the aider has the requisite scienter." TEX. REV. CIV. STAT. ANN. art. 581–33, Comment—1977 Amendment (Vernon Supp.2004–2005). Furthermore, at the time this amendment was adopted, some scholars had suggested that the policy concerns favoring a subjective scienter standard outweighed the potential investor protections available under a "should have known" standard:

> In most cases, the alleged aider and abettor ... will merely be engaging in customary business activities, such as loaning money, managing a corporation, preparing financial statements, distributing press releases, completing brokerage transactions, or giving legal advice. If each of these parties will be required to investigate the ultimate activities of the party whom he is assisting, a burden may be imposed upon business activities

that is too great. . . . The essential point is that imposition of a duty to investigate under the guise of a "should have known" standard in essence would amount to eliminating scienter as a necessary element in imposing aiding and abetting liability and the substitution of a negligence standard.

Ruder, *Multiple Defendants in Securities Law Fraud Cases: Aiding and Abetting, Conspiracy,* In Pari Delicto, *Indemnification, and Contribution,* 120 U. PA. L. REV. 597, 632–33 (1972). The Legislature presumably weighed these policy concerns when it chose to adopt the "reckless disregard" standard instead of a lower negligence or "should have known" standard.

We therefore hold that the TSA's "reckless disregard for the truth or the law" standard means that an alleged aider can only be held liable if it rendered assistance "in the face of a perceived risk" that its assistance would facilitate untruthful or illegal activity by the primary violator. TEX. REV. CIV. STAT. ANN. art. 581–33F(2); *Kolstad*, 527 U.S. at 536, 119 S.Ct. 2118. In order to perceive such a risk, the alleged aider must possess a " 'general awareness that his role was part of an overall activity that is improper.' " *Gould*, 535 F.2d at 780.

■ We further hold that the trial court's failure to include the subjective awareness requirement in the jury charge was harmful error. The investors assert that no such instruction was needed; they acknowledge that "the TSA aider liability 'reckless disregard for the truth or the law' language is not inconsistent with the federal 'general awareness' language," but argue that the charge's inclusion of the "reckless disregard" requirement was sufficient to instruct the jury on the standard for liability. We disagree. The trial court is required to "submit such instructions

and definitions as shall be proper to enable the jury to render a verdict." TEX. R. CIV. P. 277. In this case, the jury may well have thought that "reckless disregard" could be based on evidence of Sterling's negligent handling of accounts even if Sterling had no actual knowledge of Cornelius's improprieties; the plaintiffs themselves created such a risk of misinterpretation by arguing repeatedly at trial that Sterling "either knew fully what Cornelius was doing" *or* "exercised reckless disregard" by ignoring internal procedures that would have brought Cornelius's activities to light. Ignoring internal procedures that might have alerted Sterling to Cornelius's scheme may be negligence, but it is not "reckless disregard for the truth or the law." Therefore, "consider[ing] the pleadings of the parties, the evidence presented at trial, and the charge in its entirety," we conclude that the absence of an instruction on the subjective awareness requirement "was reasonably calculated [to] and probably did cause the rendition of an improper judgment." *Island Recreational Dev. Corp. v. Republic of Tex. Sav. Ass'n,* 710 S.W.2d 551, 555 (Tex.1986).

### III

■ Sterling makes two other arguments that it should be absolved of liability for aiding a securities violation. First, it argues that it cannot be liable as an aider "with respect to transactions and persons with which Sterling had no contact." As the court of appeals correctly noted, however, the TSA does not require the aider to have had direct dealing with the defrauded party; indeed, a person who "materially aids a seller" may have no contact at all with the investors. *See* TEX. REV. CIV. STAT. ANN. art. 581–33F(2).

■ Sterling also argues that it cannot be liable as an aider because the jury found in Sterling's favor on its affirmative defense that it did not know, and could not have known, of the particular misrepresentations or omissions made by Cornelius. This affirmative defense is available to persons alleged to have committed a primary violation of the securities laws. As noted above, the statute provides that a seller of a security may be held liable if it "offers or sells a security ... by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." *Id.* art. 581–33A(2). The statute permits the seller to avoid liability by proving the affirmative defense that "he (the offeror or seller) did not know, and in the exercise of reasonable care could not have known, of the untruth or omission." *Id.*

Because the jury was asked whether Sterling should be held liable as a seller, it was also asked if Sterling had established this affirmative defense; specifically, the question asked whether Sterling "did not know, and in the exercise of reasonable care, could not have known of the untruth or omission" made by the seller. The jury found that Sterling lacked such knowledge and thereby absolved Sterling of primary liability as a seller. Sterling argues that this lack of knowledge also establishes that it cannot be liable as an aider. We disagree.

The TSA provides different knowledge requirements for different classes of defendants; one standard applies to sellers, another applies to control persons, and a third standard applies to aiders. As noted above, sellers are absolved of liability if they prove that they lacked knowledge of the "untruth or omission." *Id.* Control persons may invoke a similar, but not identical, lack-of-knowledge defense:

A person who directly or indirectly controls a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer, unless the controlling person sustains the burden of proof that *he did not know, and in the exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.*

*Id.* art. 581–33F(1) (emphasis added). The control-person defense differs slightly from the one applied to sellers; instead of proving that they did not know of the "untruths or omissions," control persons must show that they did not know of "the facts by reason of which liability is alleged to exist." *Id.*

Finally, the knowledge requirement for aiders is different from both the standard for control persons and the standard for sellers:

A person who directly or indirectly *with intent to deceive or defraud or with reckless disregard for the truth or the law* materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

*Id.* art. 581–33F(2) (emphasis added). Instead of requiring the aider to establish lack of knowledge as an affirmative defense, the section on aider liability requires a plaintiff to prove that the aider acted with "intent to deceive or defraud or with reckless disregard for the truth or the law." *Id.*

The legislative history of this provision reflects that the Legislature intended to apply distinct liability standards to the different categories of defendants. The Legislature's comment to section 33F states that the provision "derives in part from Uniform Securities Act § 410(b)." *Id.* art. 581–33, Comment—1977 Amendment. Unlike the TSA, however, this section of the Uniform Securities Act applies the same standard to control persons and to aiders:

Every person who directly or indirectly controls a seller liable [for unlawful sales of securities], every partner, officer, or director of such a seller, . . . every employee of such a seller who materially aids in the sale, and every broker-dealer or agent who materially aids in the sale are also liable jointly and severally with and to the same extent as the seller, unless the nonseller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.

UNIF. SECURITIES ACT § 410(b), 7C U.L.A. 266 (1956).

It thus appears that the TSA adopted the Uniform Securities Act's liability standard for control persons but modified its standard for aiders; while the TSA allows a broader class of persons to qualify as aiders, it imposes a stricter scienter restriction on them. For example, the Uniform Securities Act of 1956 limited aider liability to a seller's employees, brokers, or agents, *id.,* but the TSA permits "[a] person" who provides material aid to be held liable. TEX. REV. CIV. STAT. ANN. art. 581–33F(2). In contrast to its narrow class of defendants, the Uniform Securities Act imposed a more relaxed scienter requirement, allowing liability to be imposed on an aider if it negligently failed to discover the facts creating liability. § 410(b). Conversely, the TSA creates a broader class of defendants, but requires more than mere negligence to impose liability; the TSA only imposes liability if the aider

acted with "intent to deceive or defraud or with reckless disregard for the truth or the law." TEX. REV. CIV. STAT. ANN. art. 581–33F(2). Furthermore, the TSA places the burden of proof on the plaintiff to prove that the defendant acted with the requisite scienter, *id.*, while the Uniform Securities Act required the defendant to prove that it acted with reasonable care. § 410(b). Finally, the TSA focuses on the aider's reckless disregard "for the truth or the law," art. 581–33F(2), instead of the aider's knowledge "of the existence of the facts by reason of which the liability is alleged." § 410(b). These modifications indicate that the Legislature gave significant consideration to the proper scienter standard for aiders. We decline to imply an additional defense not offered to aiders under the text of the statute.

Sterling argues that the failure to imply such a defense renders the statute illogical and allows secondary violators to be held liable even when a primary violator could escape liability by invoking an affirmative defense. We disagree. First, a secondary violator's liability depends upon the primary violator's culpability; even without an additional affirmative defense, a secondary violator may only be held liable "to the same extent as" the primary violator. TEX. REV. CIV. STAT. ANN. art. 581–33F(2). Thus, if it were proven that the seller reasonably believed its statements to be true, there would be no primary violation and no derivative liability to attach to the aider. Second, the Legislature did not act illogically by adopting different scienter standards for primary and secondary violators; the different standards make sense in light of the facts that these parties may reasonably be expected to know. A primary violator is the party actually making the misrepresentations or misleading omissions, and it therefore makes sense to focus on whether it knew the statements were untrue. On the other hand, an aider may know that the primary violator is engaging in improper activity, but, if the aider is not involved in the actual sale or offer of the securities, it may not know what particular misrepresentations or misleading omissions were made to the investors. Consequently, it makes sense to predicate liability on the aider's "reckless disregard for the truth or the law" rather than the aider's knowledge of specific misrepresentations or omissions. In this case, for example, Sterling argued to the jury that its answer to Question 8— whether Sterling lacked knowledge of the untrue statement or omission found to constitute securities fraud in Question 1—had to be "yes" because "Sterling Trust Company had no way of knowing what Norman Cornelius was telling or not telling these people."

The investors acknowledge that Sterling may not have known the exact misrepresentations that Cornelius was making to the investors, but they argue that Sterling did know that Cornelius was operating an illegal pyramid scheme. We agree that knowledge of such an illegal scheme, if proven, could support a finding that Sterling acted "with reckless disregard for the truth or the law" even if Sterling could not have known of the particular misrepresentations made by Cornelius. *See State ex rel. Goettsch v. Diacide Distribs., Inc.*, 561 N.W.2d 369, 382 (Iowa 1997) (permitting aider liability under Iowa's securities statute to be based on the aider's knowledge that the primary violator was engaging in "atypical business transactions [that] amounted to a Ponzi scheme"); *see also Graham v. Sec. & Exch. Comm'n*, 222 F.3d 994, 1005 (D.C.Cir.2000) (scienter established when aider continued to assist primary violator despite knowledge of his "irrational trading" and financial difficulties).

■ We acknowledge that there is some tension between the jury's finding that

Sterling acted with "reckless disregard for the truth or the law" and its finding that Sterling did not know and could not have reasonably known of "the untruth or omission" made by Cornelius. However, Sterling does not argue in this Court that the two findings conflict, and Sterling did not seek to have the jury harmonize these two answers in the trial court. *See* TEX. R. CIV. P. 295 (providing that, when a jury's verdict contains conflicting answers, "the court shall in writing instruct the jury in open court of the nature of the . . . conflict, provide the jury such additional instructions as may be proper, and retire the jury for further deliberations"). Instead, Sterling argues only that its lack of knowledge of Cornelius's "untruth or omission" establishes as a matter of law that it cannot have acted "with reckless disregard for the truth or the law." We disagree. Because the finding referred specifically to knowledge "of the untruth or omission," we conclude that this finding does not establish whether Sterling knew of Cornelius's improper activity in general, and therefore does not necessarily trump the jury's finding that Sterling acted "with intent to deceive or defraud or with reckless disregard for the truth or the law."

In this case, the jury may have agreed that Sterling could not have known what Cornelius was telling the investors but nevertheless believed that Sterling knew that Cornelius was operating an illegal pyramid scheme. Because the jury in this case was asked only whether Sterling knew of "the untruth or omission," the jury's "no" answer does not shed light on whether the jury believed that Sterling knew Cornelius was engaged in illegal activity. Sterling's argument to the jury also focused on whether Sterling had

knowledge of Cornelius's statements, not whether it had knowledge of the underlying scheme. Specifically, Sterling argued that the jury must find that Sterling "did not know, and in the exercise of reasonable care, could not have known of the untruth or omission" because Sterling "had no way of knowing what Norman Cornelius was telling or not telling these people." Consequently, we hold that the jury's finding that Sterling "did not know, and in the exercise of reasonable care could not have known of the untruth or omission" is not dispositive of the question of whether Sterling had knowledge of the underlying wrongdoing.

## IV

■ Sterling also argues that the trial court improperly instructed the jury on the standard for breach of fiduciary duty. The trial court instructed the jury that Sterling failed to comply with its fiduciary duties if:

a. Sterling Trust Company did not make reasonable use of the confidence placed in it; or

b. Sterling Trust Company did not act in the utmost good faith and did not exercise the most scrupulous honesty toward the plaintiffs; or

c. Sterling Trust Company did not place the interests of the plaintiffs before its own, used the advantage of its position to gain benefit for itself at the expense of the plaintiffs, and placed itself in a position where its self-interest might conflict with its obligations as a fiduciary.

At the charge conference, Sterling objected to this instruction,[4] arguing that it

4. The investors argue that Sterling waived error by agreeing to this instruction in an earlier pretrial hearing and by submitting a proposed charge that included a similar instruction. However, the proposed charge was superseded by a subsequent amended charge that contained no such instruction, and the alleged pretrial agreement is not part

failed to reflect Sterling's contractual limitation of its fiduciary duties. For example, in a document signed by all account holders, Sterling provided that "Sterling Trust has no responsibility to question any investment directions given by the individual regardless of the nature of the investment," and that "Sterling Trust is in no way responsible for providing investment advice." The Texas Trust Code allows parties to contractually limit a trustee's duties. *See* TEX. PROP. CODE § 113.059. Because the question on breach of fiduciary duty did not account for these contractual modifications, it was overly broad and rendered the question defective. *See Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex.1994) (holding that a question in the jury charge that defined the "unfair practice in the business of insurance" as "any act or series of acts which is arbitrary, without justification, or takes advantage of a person to the extent that an unjust or inequitable result is obtained" was defective because the statute limited the actions for which the defendant could be liable and the instruction did not reflect those limitations).

\* \* \*

For the foregoing reasons, we reverse the court of appeals' judgment and remand the case to the trial court for further proceedings consistent with this opinion.

Justice JOHNSON did not participate in the decision.

of the record. Because Sterling made a clear, timely objection and obtained a ruling, we conclude that it preserved error. *See State*

*Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex.1992).