**Steven D. DAROCY, Appellant,**

v.

**Linda ABILDTRUP, Mary Jo Fitzgerald, Nick Gusso, Patricia L. Olson, John Peterson, Richard L. Prey, James Sandager, John Faber, for Themselves and On Behalf of the Joint Venture Participants in the Oil & Gas Managing Partners 2006 A–1 Re–Entry Program, The Oil & Gas Managing Partners 2006 A–2 Re–Entry Program, The Oil & Gas Managing Partners 2006 A–3 Re–Entry Program, and The Oil & Gas Managing Partners 2006 A–4 Re–Entry Program, Appellees.**

No. 05–10–00369–CV.

Court of Appeals of Texas, Dallas.

May 26, 2011.

Steven D. Darocy, Coppell, pro se.

Kenneth C. Johnston, Julie K. Biermacher, Kane, Russell, Coleman & Logan, P.C., Jeffrey R. Erler, Bell Nunnally & Martin, Dallas, for Appellee.

Before Justices MURPHY, FILLMORE, and MYERS.

## OPINION

Opinion By Justice MYERS.

Steven D. Darocy, appellant pro se, appeals from a judgment entered against him in a lawsuit brought by Linda Abildtrup and other investors. In three issues, Darocy argues the evidence does not support the trial court's findings under the Texas Securities Act (TSA) that (1) he was a "control person," (2) he aided and abetted a breach of fiduciary duty, and (3) he aided and abetted a violation of the TSA. We affirm.

### BACKGROUND AND PROCEDURAL HISTORY

Oil & Gas Managing Partners Corporation (OGMP) was a corporate entity formed for the purpose of promoting and selling investments in oil and gas joint ventures. Michael Dannelly was the CEO and president of OGMP. Darocy served

as the secretary, treasurer, and was a member of the board. He was also a marketing and salesperson for OGMP. George Pearce likewise served as a board member. Dannelly, Darocy, and Pearce constituted the entire board of OGMP.

Beginning in June of 2006, OGMP offered unregistered securities to the public through participation in four joint ventures known as: (1) "Oil & Gas Managing Partners—2006 A–1 Re–Entry Program"; (2) "Oil & Gas Managing Partners—2006 A–2 Re–Entry Program"; (3) "Oil & Gas Managing Partners—2006 A–3 Re–Entry Program"; and (4) "Oil & Gas Managing Partners—2006 A–4 Re–Entry Program" (collectively, the "ventures"). One of the purposes of these ventures was the acquisition of working interests in oil and gas prospects consisting of three leases in Taylor County, Texas.

In prospectuses that were used to raise money for the oil and gas ventures, OGMP advertised itself as the "White Knight" of the oil and gas industry. The prospectus for the A–1 venture listed expected reserves of 500,000 to 1.5 million barrels of oil with an "expected return" of the "initial investment" in "approximately 12 to 14 months," and an anticipated "cash on cash return" of "4 to 1 (400%)." The prospectuses for the A–2, A–3, and A–4 ventures noted an anticipated "cash on cash return" of "4 to 1 (400%) or greater." OGMP eventually raised $8,327,700 from appellees, each of whom purchased interests in the ventures and became partners in those ventures. OGMP, as the managing partner of the ventures, was in charge of oil and gas operations and would "basically run the show," according to Stephen Thomas, OGMP's court-appointed receiver.

Each venture had a bank account in its name where the funds from that particular venture would be deposited. Almost immediately after deposit, the funds in each venture account would be transferred to one of three accounts that were controlled by OGMP and a related entity, Golden Triangle Energy Corporation.[1] Thomas testified that "[i]mmediately, almost daily, all of the money was swept and cleaned out of these accounts and placed into one of the three accounts." OGMP, however, commingled the funds for the various oil and gas ventures. According to Thomas, the "money was thoroughly scrambled or commingled to where you could not segregate the operations of one joint venture from the other."

One of the joint venture investors, Gary Wayne Lindeberger, described his role as an individual investor in the ventures as "passive." He recalled that he would "just get the money" and "wait for the check to come." Lindeberger testified that Darocy communicated directly with him regarding the status of OGMP's oil and gas operations, and that Darocy indicated he was overseeing and managing the oil and gas operations. Darocy also said that two of the wells would be producing a hundred barrels of oil a day. Lindeberger asked various representatives of OGMP, including Darocy, for "better information" regarding the oil and gas investments, "like logs and reports," but it was not provided and what information Lindeberger received "was poor" and was "delivered poorly." Lindeberger also testified that, on March 19, 2006, he asked Darocy when the IRS schedule K–1 tax forms would be issued. Lindeberger was concerned because the April 15 tax filing deadline was approaching. According to Lindeberger, Darocy told him the IRS forms would be distributed in three to four days. But as Lindeberger recalled, "that didn't happen."

---

1. The record does not tell us how Golden Triangle Energy was affiliated with OGMP.

There was conflicting evidence regarding the extent of Darocy's access to and control over OGMP accounts and funds. According to the OGMP bylaws, Darocy's position as treasurer vested him with custody of all corporate funds and securities and required him to keep full and accurate accounts of receipts and disbursements. As treasurer of OGMP, Darocy was authorized to pay OGMP's expenses and was responsible for money in the OGMP accounts. Thomas testified that, in addition to the three bank accounts controlled by OGMP, three Wachovia Bank accounts were opened by Darocy in OGMP's name. Approximately $223,000 was deposited into the Wachovia accounts, and those funds were intended as investments in one of the ventures.

During his testimony, Darocy asserted that the bylaws were never filed and he assumed the title of secretary and treasurer "in name only." Darocy maintained he was nothing more than a "marketing and salesperson" for OGMP. He acknowledged that he had opened an account for OGMP with Dannelly at Bank One, but Darocy argued he "never got a signature card" for that account and he was not "allowed to get back in that bank" or to examine OGMP's other accounts until it was too late. Darocy noted that "[w]e did have an agreement" whereby "no check over a thousand dollars would be written unless there were two signatures." However, Darocy admitted that he failed to consider that Dannelly would simply transfer the money out of the account, which is, as Darocy acknowledged, "exactly what happened." Darocy also testified that he tried to obtain the K–1 tax forms but could not do so because he was "blocked out of the bank" and had no operational authority over OGMP. Darocy insisted Dannelly was "the real kingpin here."

The operator in charge of OGMP property in Taylor County, Ed Guelker, testified that he depended on money from Golden Triangle Energy to pay invoices and bills related to the oil and gas operations. Golden Triangle Energy, in turn, got the money to pay those invoices and bills from OGMP. Beginning in August of 2006, however, there were not enough funds in the operator's account to pay the outstanding invoices, and checks started to "bounce." Guelker testified that he spoke with Darocy about this problem. According to Guelker, Darocy acknowledged there was a problem regarding insufficient funds and indicated "that he would look into it." Guelker noted that he did not believe he could turn to Dannelly, the CEO, for assistance, because, according to Guelker, Dannelly "was gambling all the time" and "spending money in places that he didn't need to be spending money." Guelker thought that "money was being squandered on things that didn't need to be spent."

Asked to provide specific examples of what he regarded as improper expenditures of OGMP funds, Guelker recalled that when "we had meetings and I was in town, there would be a limo that would come by and pick us up." Dannelly also sometimes used a limousine to drive him to meetings. Guelker remembered once being driven in a limousine to a gentlemen's club, and that he was accompanied by Darocy. Guelker overheard company officials talking about spending money at casinos and "charg[ing] anything they wanted to their room," including "expensive bottles of liquor or alcohol," "golf shirts," and "a lot of golf." Guelker felt as though "money was being spent needlessly where we needed it to be paying invoices," and that "there was a lot of money spent at that time and it was very, very, very excessive waste." He trusted Darocy "to maybe try to salvage something out of what [Guelker]

saw was happening" and believed Darocy had enough influence and control over OGMP "to kind of help move things in the right direction."

Of the more than eight million dollars raised by OGMP for the oil and gas ventures, slightly over two million was used for oil and gas operations. Prospectuses from OGMP that were used to market the ventures represented that the venture funds would be used for oil and gas operations. Yet, according to Thomas, $1.9 million in venture funds "went directly to two casinos in Shreveport and Bossier City, Louisiana," and $430,000 in venture funds was used for "nonbusiness expenses" such as gentlemen's clubs, jewelers, "laundry/cleaners," and "retail stores that are not normally associated with business supplies or business purposes."

On March 12, 2007, the appellees sued OGMP, Golden Triangle Energy Corp., Dannelly, Darocy, and Pearce for various violations of the TSA and breaches of fiduciary duties regarding the oil and gas joint ventures. On April 16, Darocy sent an e-mail to the investors stating that Dannelly had been removed as CEO and president of OGMP and that Darocy had replaced him. In the e-mail, Darocy stated that "[t]here will be up to date reports sent to all partners in regards to the business of their particular partnership participating; including, but not limited to the K–1 reports for the 2006 tax year." No such reports were provided. Darocy sent another e-mail to the investors on May 10, 2007, stating that he had resigned from OGMP. In this e-mail, he offered investors the opportunity to invest additional funds in a new partnership and "to participate in the restructuring and obtain an interest in producing wells."

Five days later, on May 15, 2007, the court appointed Thomas as an equitable receiver, among other things, to manage the oil and gas operations associated with the ventures' oil and gas prospects. When Thomas took over operation of the ventures, he discovered only one well had been completed but it was "in disarray," and another well had been drilled but was "not completed." In addition, according to Thomas, "angry vendors" had not been paid for work performed. Thomas raised $120,000 in new funds from investors to "rehabilitate" operations on one well but after limited success, those additional funds were exhausted and the operations ceased. The oil and gas leases eventually lapsed due to lack of operations. The investors lost all of the money they invested in the ventures, including the additional money provided during the receivership to "rehabilitate" operations.

Before trial, OGMP agreed to a judgment of $9,500,000 plus $750,000 in attorney's fees. Dannelly agreed to a separate judgment of $2,500,000. Appellees dismissed Pearce. The case against Darocy, the only remaining defendant,[2] was tried to the court on August 25, 2009, and on February 9, 2010, the trial court signed a final judgment stating that Darocy was jointly and severally liable with the other defendants for a sum up to $1,500,000, plus post-judgment interest. On April 7, 2010, the court signed its findings of fact and conclusions of law. This appeal followed.

## DISCUSSION

### "Control Person" under the Texas Securities Act

In his first issue, Darocy argues the trial court's finding that he violated the TSA

---

**2.** The record does not indicate how the case against Golden Triangle Energy was resolved, but the trial court's judgment states that after the agreed judgments involving Dannelly and OGMP, and the dismissal of Pearce, "this matter came on for trial against the sole remaining Defendant, Steven Darocy."

"by directly or indirectly controlling OGMP to the same extent as if [Darocy] was the seller of the joint venture interests" is not supported by legally or factually sufficient evidence.

■ We review a trial court's conclusions of law de novo. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 794 (Tex.2002). Findings of fact in a nonjury trial such as the one that occurred in this case have the same force and dignity as a jury's verdict. *See, e.g., Lewis v. Dallas Soundstage, Inc.,* 167 S.W.3d 906, 912 (Tex.App.-Dallas 2005, no pet.) (citing *Catalina v. Blasdel,* 881 S.W.2d 295, 297 (Tex.1994)). When, as here, a complete reporter's record is filed, the trial court's findings of fact may be reviewed for legal and factual sufficiency under the same standards as jury verdicts. *Id.*

■ When we review legal sufficiency, we review the evidence in a light that tends to support the finding of the disputed facts and disregard all evidence and inferences to the contrary. *Lee Lewis Constr., Inc. v. Harrison,* 70 S.W.3d 778, 782 (Tex.2001). We must credit the favorable evidence if reasonable jurors could and disregard the contrary evidence unless reasonable jurors could not. *City of Keller v. Wilson,* 168 S.W.3d 802, 827 (Tex.2005). If there is more than a scintilla of evidence to support the finding, the legal sufficiency challenge fails. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.,* 960 S.W.2d 41, 48 (Tex.1998); *see also King Ranch, Inc. v. Chapman,* 118 S.W.3d 742, 751 (Tex.2003) (more than scintilla of evidence exists when evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions"). When reviewing the factual sufficiency of evidence, we examine all the evidence and set aside a finding only if it is so contrary to the evidence as to be clearly wrong and unjust. *Cameron*

*v. Cameron,* 158 S.W.3d 680, 683 (Tex. App.-Dallas 2005, pet. denied).

■ In conducting our review of both the legal and factual sufficiency of the evidence, we are mindful that the fact finder was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller,* 168 S.W.3d at 819; *Hinkle v. Hinkle,* 223 S.W.3d 773, 782 (Tex.App.-Dallas 2007, no pet.). We may not substitute our judgment for the fact finder's, even if we would have reached a different answer. *See Maritime Overseas Corp. v. Ellis,* 971 S.W.2d 402, 407 (Tex.1998); *Hinkle,* 223 S.W.3d at 782. The court of appeals is not a finder of fact. *Maritime Overseas Corp.,* 971 S.W.2d at 407.

■ The TSA establishes both "primary" and "secondary" liability for securities violations. *Sterling Trust Co. v. Adderley,* 168 S.W.3d 835, 839 (Tex.2005). "Primary" liability arises when a person offers to sell or buy a security "by means of an untrue statement of a material fact or an omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading." *Id.* In contrast, secondary liability is derivative liability for another person's securities violation either because he is a "control person" or because he "aided" the seller or buyer of the securities. *Id.*

> Secondary liability is derivative liability for another person's securities violation; it can attach to either a control person, defined as '[a] person who directly or indirectly controls a seller, buyer, or issuer of a security,' or to an aider, defined as one 'who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security.'

*Id.* (quoting Tex.Rev.Civ. Stat. Ann. art. 581–33(F) §§ 1, 2). Appellees asserted a TSA article 581–33(F) secondary liability claim against Darocy.

■ We use the same general definitions of control used under federal securities law. *Barnes v. SWS Fin. Servs.*, 97 S.W.3d 759, 763 (Tex.App.-Dallas, 2003, no pet.); *Frank v. Bear, Stearns & Co.*, 11 S.W.3d 380, 384 (Tex.App.-Houston [14th Dist.] 2000, pet. denied). "Control means the possession, direct or indirect, of the power to direct or cause the direction of the management or policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Frank*, 11 S.W.3d at 384. "Federal courts construing control person liability have fashioned a two-prong test: that the defendant exercised control over the operations of the corporation in general, and that the defendant had the power to control the specific transaction or activity upon which the primary violation is predicated." *Frank*, 11 S.W.3d at 384 (citing *Abbott v. Equity Group Inc.*, 2 F.3d 613, 620 (5th Cir.1993)). The injured investor is not required to show that the defendant participated in the alleged violation in order to establish control person liability. *Barnes*, 97 S.W.3d at 764 (applying *Frank* test to determine whether individual was control person under TSA). "Texas courts interpreting this requirement have held only that a major shareholder or director is a 'control person' for purposes of the statute." *Frank*, 11 S.W.3d at 384.

■ "Both control persons and aiders are jointly and severally liable with the primary violator 'to the same extent as if [they] were' the primary violator." *Sterling*, 168 S.W.3d at 839. Because secondary liability is derivative liability for another person's securities violation, before a party, such as Darocy, can be held second-arily liable, there must first be a primary violation. *Id.*

Neither party in this case disputes that OGMP violated the TSA. According to court findings that are not challenged by either party, "OGMP sold securities to the [appellees] in violation of the" TSA. OGMP also violated the TSA "by making untrue statements of material fact and by failing to state material facts necessary to make the statements made, in light of the circumstances under which they are made to [appellees], not misleading."

■ Turning to the question of control, the record supports the trial court's finding that, insofar as the TSA was concerned, Darocy was a "control person" of OGMP. In addition to Darocy's status as a board member, secretary, and treasurer of OGMP, evidence shows he exercised control over the general operations of the corporation and had the power to control the specific transaction or activity upon which the primary violation was predicated. *See Frank*, 11 S.W.3d at 384. The trial court, as the finder of fact, determines the weight to be given the evidence. Reviewed under the appropriate standards, the court's finding is supported by legally and factually sufficient evidence. We overrule Darocy's first issue.

### Aiding and Abetting Breach of Fiduciary Duty

In his second issue, Darocy challenges the court's finding that he "aided and participated in the breaches of OGMP's fiduciary duties" to appellees.

■ When a defendant knowingly participates in the breach of a fiduciary duty, he becomes a joint tortfeasor and is liable as such. *Kastner v. Jenkens & Gilchrist, P.C.*, 231 S.W.3d 571, 580 (Tex. App.-Dallas 2007, no pet.); *see also Kinzbach Tool Co. v. Corbett–Wallace Corp.*,

138 Tex. 565, 160 S.W.2d 509, 513–14 (Tex. 1942). A cause of action based on a contribution to a breach of fiduciary duty must involve the defendant's knowing participation in such a breach. *Kastner*, 231 S.W.3d at 580; *Cox Tex. Newspapers, L.P. v. Wootten*, 59 S.W.3d 717, 722 (Tex.App.-Austin 2001, pet. denied). A claim that a defendant knowingly participated in a breach of fiduciary duty by a third party necessarily hinges on the existence of a fiduciary duty owed by the third party to the plaintiff. *Cox Tex. Newspapers*, 59 S.W.3d at 722. In addition to the existence of a fiduciary duty, the plaintiff must show the defendant knew of the fiduciary relationship and was aware of his participation in the third party's breach of its duty. *Id.*

▮ OGMP served as the managing partner of the ventures. As the managing partner, OGMP owed the other partners fiduciary duties of loyalty that are among the highest duties recognized in the law, *see Huffington v. Upchurch*, 532 S.W.2d 576, 579 (Tex.1976), and there is no dispute that OGMP breached its fiduciary duties to investors and that those breaches resulted in injury to appellees. According to court findings that are not challenged by either party, OGMP breached its fiduciary duties by, among other things: (1) failing to manage the day-to-day operations of the ventures with loyalty and fidelity; (2) failing to manage the ventures in a prudent and business-like manner and in accordance with the standard commercial practices in the oil and gas industry; (3) failing to act in the best interest of the ventures; (4) failing to notify the investors of any and all transactions entered into between the ventures and OGMP or its affiliates; (5) failing to keep books and records; (6) failing to provide annual statements with respect to the oil and gas operations, related party transactions and similar matters; and (7)

failing to maintain segregated bank accounts.

▮ Evidence of Darocy's role and involvement in OGMP's accounts and funding, his oversight and management of the oil and gas operations, and his knowledge of problems regarding insufficient funds and outstanding invoices, support the court's finding that Darocy knew of the fiduciary relationship and knowingly participated in OGMP's breach of its fiduciary duty. As noted before, the trial court, as the finder of fact, determines the weight to be given the evidence. When viewed under the appropriate standards, there is legally and factually sufficient evidence to support the court's finding. We overrule Darocy's second issue.

### Aiding and Abetting Violation of TSA

In his third issue, Darocy challenges the trial court's finding that he "violated the Texas Securities Act by directly or indirectly, with the intent to deceive or defraud, [aiding] OGMP in the sale of joint venture interests."

▮ Section two of article 581–33(F) of the TSA provides as to joint and several liability of aiders and abettors in fraudulent securities transactions:

A person who directly or indirectly with intent to deceive or defraud or with reckless disregard for the truth or the law materially aids a seller, buyer, or issuer of a security is liable under Section 33A, 33B, or 33C jointly and severally with the seller, buyer, or issuer, and to the same extent as if he were the seller, buyer, or issuer.

TEX.REV.CIV. STAT. ANN. art. 581–33F § 2 (West Supp. 2010). To prove aider-and-abettor liability, the plaintiff must demonstrate:

(1) that a primary violation of the securities laws occurred; (2) that the alleged

aider had "general awareness" of its role in this violation; (3) that the actor rendered "substantial assistance" in this violation; and (4) that the alleged aider either (a) intended to deceive plaintiff or (b) acted with reckless disregard for the truth of the representations made by the primary violator.

*Frank,* 11 S.W.3d at 384; *see also In re Enron Corp. Sec., Derivative & ERISA Litig.,* 235 F.Supp.2d 549, 568 (S.D.Tex. 2002). In *Sterling,* the court concluded that "an alleged aider can only be held liable if it rendered assistance 'in the face of a perceived risk' that its assistance would facilitate untruthful or illegal activity by the primary violator." *Sterling,* 168 S.W.3d at 842 (citing TEX.REV.CIV. STAT. ANN. art. 581–33(F) § 2; *Kolstad v. Am. Dental Ass'n,* 527 U.S. 526, 536, 119 S.Ct. 2118, 144 L.Ed.2d 494 (1999)). "In order to perceive such a risk, the alleged aider must possess a 'general awareness that his role was part of an overall activity that is improper.'" *Id.* (quoting *Gould v. American–Hawaiian S.S. Co.,* 535 F.2d 761, 780 (3d Cir.1976)).

Applying these principles, we first note that it is undisputed that OGMP violated the TSA. As for Darocy's "general awareness" of his role in the violation and whether he provided "substantial assistance" in the violation, evidence shows that Darocy was the secretary and treasurer of OGMP. He had access to OGMP accounts and control over how those accounts were set up and was authorized to pay the expenses of OGMP. Evidence also shows that Darocy was aware of problems in the funding of the oil and gas operations as early as August 2006 and that Guelker spoke to Darocy about these problems. Darocy acknowledged there was a problem and indicated he would look into it, but those difficulties remained unresolved until the receiver was appointed. In addition,

on August 16, 2007, Darocy sent an e-mail to the investors indicating that Dannelly had been removed as CEO and president of OGMP and that Darocy had replaced him. Darocy stated that "up to date reports" would be sent to all investors, but no such reports were provided. Darocy sent another e-mail to the investors on May 10, 2007, stating he had resigned from OGMP. Darocy offered investors the opportunity to invest additional funds in order to restructure and "obtain an interest in producing wells."

As the finder of fact, the trial court determines the weight to be given the evidence. Based on the evidence presented, the trial court could have concluded Darocy intended to deceive investors or acted with reckless disregard for the truth of the representations made by OGMP. When viewed under the appropriate standards, there is legally and factually sufficient evidence to show he aided and abetted OGMP's violation of the TSA. We therefore overrule Darocy's third issue.

We affirm the trial court's judgment.