Affirmed and Memorandum Opinion filed November 9, 2010.

 

In The

 

Fourteenth Court of
Appeals

___________________

 

NO. 14-09-00268-CV

___________________

 

1993 GF Partnership; Campbell Capital, Ltd.;
Chevy Chase Partners, L.P.; Philip H. Corboy, Jr.; Dorsar Partners, L.P.;
Stephen L. Feinberg; Huron Investors Partnership; Liberation Investments Joint
Venture; James M. Mallick, as Trustee for the J.M. Mallick Revocable Trust Dated
8/26/87; Julian Mickelson; PDM Investment Co., L.P.; John Schweitzer; Philip W.
Shaltz; TST Holdings, LLC; Ronald E. Warner; all derivatively on behalf of St.
James Merchant Bankers, L.P.; Antar & Co.; and St. James Capital Partners,
L.P.; Appellants

 

V.

 

Simmons & Co. International and Warrior
Energy Services Corporation, Appellees



 



 

On
Appeal from the 129th District Court

Harris County,
Texas



Trial Court Cause No. 2004-70333B

 



 

 

MEMORANDUM OPINION

Appellants, 1993 GF Partnership; Campbell Capital,
Ltd.; Chevy Chase Partners, L.P.; Stephen L. Feinberg; Huron Investors
Partnership; Liberation Investments Joint Venture; James M. Mallick, as Trustee
for the J.M. Mallick Revocable Trust Dated 8/26/87; Julian Mickelson; PDM
Investment Co., L.P.; John Schweitzer; Philip W. Shaltz; TST Holdings, LLC;
Ronald E. Warner; all derivatively on behalf of St. James Merchant Bankers,
L.P. (“SJMB”); Antar & Co.; and St. James Capital Partners, L.P. (“SJCP”)  appeal
from a final judgment entered following the trial court granting motions for
partial summary judgment filed by appellees, Simmons & Co. International
(“Simmons”) and Warrior Energy Services Corporation (“Warrior”).  Finding no
error, we affirm.

Factual and Procedural
Background

Both SJMB and SJCP invested in Warrior, an oilfield
services company, through a series of bridge loans until they ultimately owned
a majority interest in Warrior.  Charles Underbrink was the majority owner of
the general partner of both limited partnerships throughout most of the
relevant time period.  The relationship between Warrior and Underbrink was
rocky as Underbrink, seeking to maximize the value of the limited partnerships’
investment in Warrior, prevented several potential “merger” deals from going
through.[1] 
Eventually, the relationship reached the point where the limited partnerships desired
to liquidate their investments in Warrior and Warrior management wanted to get
rid of the limited partnerships’ controlling interest in Warrior.  This
resulted in the parties (the two limited partnerships, Underbrink, who also was
a significant investor in Warrior, and Warrior) negotiating and entering into
three recapitalization agreements (“the Recap Agreements”).  Under the terms of
the Recap Agreements, Warrior agreed to enter into a “Secondary Public
Offering” (“SPO”)[2]
where Warrior would issue and sell stock and would then use the proceeds of
that stock sale to purchase all of the limited partnerships’ interests in
Warrior.[3] 
Warrior agreed that, for each share of stock sold in the public offering,
Warrior would buy one share of stock from the limited partnerships.  The
limited partnerships agreed to sell all of their interest in Warrior as long as
the price per share was at least $7.50.[4]

The provisions of the Recap Agreements relevant to
this appeal include paragraph F of the “Background,” which provides:

F.         The Holder[5]
desires to convert the Holder Notes into Conversion Shares and transfer and
assign to the Company the Holder Warrants, SJMB Shares and Conversion Shares on
the terms set forth herein.

Then, in the “Agreement” section:

2.1       Commercially Reasonable Efforts of the
Company.  The Company[6]
agrees that it shall promptly after the expiration of the Exchange Period use
its commercially reasonable efforts to complete an Underwritten Offering.  Such
commercially reasonable efforts shall include, among other things, contacting
and soliciting prospective investment bankers to act as underwriters or agents
of the Company in effecting such transaction, providing to the prospective
investment bankers such financial and other information concerning the Company
as may be reasonably requested, providing reasonable access to the management
of the Company, its advisors and the Company’s facilities as is requested by
the prospective investment bankers, fulfilling the Company’s obligations set
forth in this Article II and otherwise enabling such investment bankers to have
the opportunity to engage in “due diligence” activities with respect to the Company
and its management and completing the Underwritten Offering on such terms as
will yield Net Proceeds, after deducting such amount of Net Proceeds as are to
be retained by the Company for its corporate purposes, sufficient to enable the
Company to purchase all the Conversion Shares, SJMB Shares and such number of
Exchange Share equivalents as are to be purchased by the Company, subject to
paragraph 2.2 hereof, at the Closing Time of the Underwritten Offering.

2.2       Terms of Underwritten Offering.  If the managing
underwriter[7]
of the Underwritten Offering concludes in its reasonable judgment that the
number of shares to be registered for selling shareholders would materially
adversely affect such offering and that the number of Conversion Shares and
Exchange Shares to be registered in such offering shall be reduced, the Holder,
St. James Capital Partners, L.P., and each of the Underbrink Family Entities,
under the terms of this Agreement and the other Recapitalization Agreements
such persons have into with the Company, severally and not jointly agree that
the number of Conversion Shares, SJMB Shares and Exchange Share Equivalents to
be purchased from them by the Company at the Closing Time shall be reduced in
accordance with Addendum C hereto to the extent necessary in order that the number
of Conversion Shares and Exchange Shares to be registered for sale in the
Underwritten Offering by the Other Derivatives Holders will no longer, in the
reasonable judgment of the managing underwriter, materially adversely affect
the Underwritten Offering.

2.3       Underwritten Offering Defined.  An
“Underwritten Offering” means a sale of such number of Shares of Common Stock
of the Company conducted on such terms and conditions, in compliance with the
provisions of the Securities Act, and at such price per share of Common Stock
and on other terms and conditions as the Company may in its sole and exclusive
discretion determine to complete and as will result in sufficient Net Proceeds,
subject to paragraph 2.2. hereof, to enable the Company to purchase not less
than all of the Conversion Shares, SJMB Shares and Exchange Share Equivalents
to be sold by the Underbrink Family Entities and the St. James Partnerships and
purchased by the Company, provided, however, that the Underbrink Family
Entities and the St. James Partnerships shall only be obligated to sell their
Conversion Shares, SJMB Shares and Exchange Share Equivalents to the Company if
the purchase price paid per Conversion Share, SJMB Share and Exchange Share
Equivalent is not less than [$7.50] per share (before reflecting stock split,
divisions, reverse stock splits or share combinations)….

3.1       Sale of Conversion Shares at the Closing Time
of the Underwritten Offering.  Provided that the Net Price Per Share to be
paid to the Holder by the Company at the Closing Time of the Underwritten
Offering is not less than [$7.50] per share (before reflecting stock splits,
divisions, reverse stock splits or share combinations), the Holder agrees to
sell to the Company the Holder’s Conversion Shares and the Company agrees to
purchase at the Closing Time all the Holder’s Conversion Shares out of the Net
Proceeds of the Underwritten Offering and in accordance with Article I hereof. 
The Holder agrees to accept the Net Price Per Share determined as provided in
paragraph 2.5 hereof for Holder’s Conversion Shares, provided that the Net
Price Per Share is not less than [$7.50] per share (before reflecting stock
splits, divisions, reverse stock splits or share combinations). …

3.3       Sale of Warrants and SJMB Shares at Closing
Time of Underwritten Offering.  Provided that the Net Price Per Share to be
paid to the Holder by the Company at the Closing Time of the Underwritten
Offering is not less than [$7.50] for each Warrant Unit and SJMB Share sold
(before reflecting stock splits, divisions, reverse stock splits or share
combinations) and subject to paragraph 2.2 hereof, the Holder hereby agrees to
sell to the Company the Holder’s Warrants and SJMB Shares and the Company
agrees to purchase at the Closing Time all the Holder’s Warrants and SJMB
Shares out of the Net Proceeds of the Underwritten Offering.  At the Closing
Time, Holder agrees to execute and deliver to the Company, at the location set
as the place for the closing the Underwritten Offering, the warrant assignment
attached hereto as Addendum D (the “Warrant Assignment”) with respect to the
Warrants sold to the Company and a Stock Assignment with respect to the SJMB
Shares sold to the Company.  The Holder agrees to accept the Net Price Per
Share as the purchase price for each Warrant Unit and SJMB Share sold determined
as provided in paragraph 2.5 hereof for its Warrants and SJMB Shares, provided
that the Net Price Per Share is not less than [$7.50] for each Warrant Unit and
SJMB Share (before reflecting stock splits, divisions, reverse stock splits or
share combinations). …

6.5       Holder’s Acknowledgement.  The Holder
acknowledges that the Company now possesses and may hereafter possess certain
non-public information concerning the Company and its prospects and proposed
transactions beyond the transactions contemplated in this Agreement that may or
may not be independently known to the Holder or other Derivatives Holders (the
“Company Non-Public Information”) which information may constitute material
information.  The Holder agrees to the terms and conditions of this Agreement
notwithstanding that it is aware that Company Non-Public Information may exist
and that the Company has not disclosed any Company Non-Public Information to
Holder or, if such information has been disclosed, it has been disclosed under
the terms of a confidentiality agreement.  The Holder acknowledges that it is a
sophisticated investor and is acting independently with respect to the
transactions set forth in this Agreement and that the Company has no
obligations to the Holder to disclose such Company Non-Public Information and
it has no fiduciary obligations to the Holder.  Additionally, the Holder
acknowledges that it has adequate information concerning the transactions
contemplated in this Agreement, and the business and financial condition of the
Company and its prospects, to make an informed decision regarding entering into
this Agreement, and it has done so independently and without reliance upon the
Company and based on such information as the Holder has deemed appropriate,
made its own analysis and decision to enter into this Agreement with the
Company.  Holder understands and acknowledges that the market value of the
Company’s shares of Common Stock after the Closing Time of the Underwritten
Offering may exceed the price realized by the Holder out of the Net Proceeds of
the Underwritten Offering. …

7.1       Governing Law.  This Agreement shall be
governed in all respects by the laws of the State of Delaware. …

7.8       Enforcement of Agreement.  Holder
acknowledges and agrees that the Company could be damaged irreparably if any of
the provisions of this Agreement are not performed in accordance with their
specific terms.  Accordingly, the Holder agrees that (i) it will waive, in any
action for specific performance, the defense of adequacy of a remedy at law,
and (ii) in addition to any other right or remedy to which the Company may be
entitled, at law or in equity, the Company will be entitled to enforce any
provision of this Agreement by a decree of specific performance and to
temporary, preliminary and permanent injunctive relief to prevent breaches or
threatened breaches of any of the provisions of this Agreement, without posting
any bond or other undertaking.

To carry out the SPO, Warrior retained several
underwriters, including Simmons.  The chief underwriter was Raymond James. 
According to the appellate record, the underwriters would purchase the new
shares of stock from Warrior and then sell those shares on the open market. 
The difference between the amount the underwriter initially paid for the stock
and the amount it, in turn, sold the stock for on the open market, the so
called aftermarket, would constitute the underwriters’ payment for serving as an
underwriter.  The chief underwriter, in this instance Raymond James, maintained
the book of orders and had the responsibility for setting the initial price per
share that would be paid to Warrior for the new shares of stock.

The parties signed the Recap Agreements in October of
2005.  In early April of 2006, Raymond James set the share price range for the
proposed SPO of Warrior stock at $20.00 to $23.00.  This range was publicly
disclosed in the S-1 registration statement filed with the Securities and
Exchange Commission on April 3, 2006.   The so-called “Road Show” then took
place and a great deal of interest in the SPO was revealed.  On April 18, 2006,
during the “Pricing Call,” Raymond James employee Bonnie Bishop set the price
per share at $23.50.[8] 
Appellants contend that appellees committed fraud and violated the Texas
Securities Act (“TSA”)[9]
during the Pricing Call when, in response to questions from Underbrink about the
possibility of getting a higher price per share, they allegedly represented
that $23.50 was the “best deal” they could get.[10]  At this price,
Warrior would be able to buy out the entire interest of the limited partnerships
and Underbrink.  Once Bishop set the price, Warrior had the option to either
accept or reject this price.  Warrior accepted the price.

The SPO was, by all accounts, a success because,
according to the summary judgment evidence, the timing was nearly perfect as
Warrior ultimately paid the limited partnerships $142 million for their
interests in Warrior.  Following the SPO, the price of Warrior stock quickly rose
to a high of $31.50 per share before dropping to a price of less than $15.00
per share by the summer.  Despite the apparent success of the SPO, appellants were
dissatisfied with the amount of return they had received on their investment.

That dissatisfaction found an outlet in litigation
that started as a derivative suit filed by the limited partners of SJMB against
the auditor of that limited partnership.  From that start, the litigation grew
to involve the dispute at issue in this appeal as well as parties and issues
not relevant to this appeal.  Eventually, a second limited partnership, SJCP,
intervened in the suit against appellees.  Appellants were upset with the
result of the sale of their investment in Warrior and brought suit against
appellees alleging (1) violations of the TSA, (2) breach of contract against Warrior,
(3) statutory and common-law fraud, and (4) tortious interference with contract
against Simmons.[11] 
Eventually, both Simmons and Warrior moved for summary judgment on each cause
of action asserted against them.  The trial court granted appellees’ motions but
only on specified grounds.  The trial court then severed those causes of action
and entered a final judgment paving the way for this appeal.[12]

Discussion

            In four issues on
appeal, appellants challenge the trial court’s granting of Warrior and Simmons’
motions for summary judgment on each of the causes of action appellants
asserted against appellees.

I.         The Standard of
Review.

            This case
involves summary judgment motions asserting both no-evidence and traditional
grounds.  In a traditional motion for summary judgment, the movant has the
burden to show there is no genuine issue of material fact and it is entitled to
judgment as a matter of law.  Nixon v. Mr. Prop. Mgmt. Co., 690 S.W.2d
546, 548 (Tex. 1985).  In determining whether there is a genuine fact issue
precluding summary judgment, evidence favorable to the non-movant is taken as
true and the reviewing court makes all reasonable inferences and resolves all
doubts in the non-movant’s favor.  Id. at 548–49.  If there is no
genuine issue of material fact, summary judgment should issue as a matter of
law.  Haase v. Glazner, 62 S.W.3d 795, 797 (Tex. 2001).  A defendant who
conclusively negates at least one of the essential elements of a plaintiff’s
cause of action is entitled to a summary judgment on that claim.  IHS Cedars
Treatment Ctr. of DeSoto, Tex., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex.
2004).  A defendant is entitled to summary judgment on an affirmative defense
if the defendant conclusively proves all the elements of the affirmative
defense.  Rhone-Poulenc, Inc. v. Steel, 997 S.W.2d 217, 223 (Tex. 1999). 
Once a defendant establishes its right to summary judgment, the burden then
shifts to the plaintiff to come forward with competent controverting summary
judgment evidence raising a genuine issue of material fact.  Centeq Realty,
Inc. v. Siegler, 899 S.W.2d 195, 197 (Tex. 1995).

            In a no-evidence
motion for summary judgment, the movant must specifically state the elements as
to which there is no evidence.  Walker v. Thomasson Lumber Co., 203
S.W.3d 470, 473–74 (Tex. App.—Houston [14th Dist.] 2006, no pet.).  The trial
court must grant the motion unless the non-movant produces summary judgment
evidence raising a genuine issue of material fact on each of the challenged
elements.  Tex. R. Civ. P. 166a(i).  However, the non-movant is not required to
marshal its proof; its response need only point out evidence that raises a fact
issue on the challenged elements.  Hamilton v. Wilson, 249 S.W.3d 425,
426 (Tex. 2008).

            A no-evidence
summary judgment is essentially a pretrial directed verdict, and we apply the
same legal sufficiency standard in reviewing a no-evidence summary judgment as
we apply in reviewing a directed verdict.  Mathis v. Restoration Builders,
Inc., 231 S.W.3d 47, 50 (Tex. App.—Houston [14th Dist.] 2007, no pet.).  We
review the entire record in the light most favorable to the non-movant,
indulging every reasonable inference and resolving any doubts against the
motion.  City of Keller v. Wilson, 168 S.W.3d 802, 824 (Tex. 2005).  We
sustain a no-evidence summary judgment if (1) there is a complete absence of
proof of a vital fact; (2) the rules of law or evidence bar the court from
giving weight to the only evidence offered to prove a vital fact; (3) the
evidence offered to prove a vital fact is no more than a scintilla; or (4) the
evidence conclusively establishes the opposite of a vital fact.  Walker,
203 S.W.3d at 474.  Less than a scintilla of evidence exists when the evidence
offered to prove a vital fact is so weak it does no more than create the mere
surmise or suspicion of its existence and, in legal effect, is no evidence.  Ford
Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004).  More than a
scintilla of evidence exists when the evidence rises to a level that would
enable reasonable and fair-minded people to differ in their conclusions as to
the existence of the vital fact.  Id.

We review a trial court’s summary judgment de novo.  Valence
Operating Co. v. Dorsett, 164 S.W.3d 656, 661 (Tex. 2005).  In an appeal
from a summary judgment, the issues an appellate court may review are those the
movant actually presented to the trial court.  Cincinnati Life Ins. Co. v.
Cates, 927 S.W.2d 623, 625 (Tex. 1996).  An appellate court is not
precluded from affirming the judgment on other grounds the parties properly raised
before the trial court, if the trial court grants summary judgment specifically
on fewer than all grounds asserted.  Id.  To preserve a ground for
appellate review, a party need only raise the ground in the trial court and
then present it in a cross-issue on appeal.  Kelly v. Brown, 260 S.W.3d
212, 216 (Tex. App.—Dallas 2008, pet. denied).  Finally, if an appellant fails
to challenge each independent ground on which a summary judgment is based, the
summary judgment should be affirmed.  Adams v. First Nat’l Bank of
Bells/Savoy, 154 S.W.3d 859, 875 (Tex. App.—Dallas 2005, no pet.).

II.        Did the trial
court err when it granted Warrior’s motion for summary judgment on appellants’
TSA claims?

            In their first
issue, appellants contend the trial court erred when it granted Warrior’s
motion for summary judgment on appellants’ TSA causes of action.  Appellants
contend Warrior violated Article 581-33(B) when it allegedly misrepresented
that $23.50 was the best price that could be obtained for Warrior’s stock in
the SPO.  See Tex. Rev. Civ. Stat. Ann. art. 581-33(B) (West Supp.
2009).  Article 581-33(B) provides, in pertinent part:

            Liability of Buyers.  A person who offers to
buy or buys a security (whether or not the security or transaction is exempt
under Section 5 or 6 of this Act) by means of an untrue statement of a material
fact or an omission to state a material fact necessary in order to make the
statements made, in the light of the circumstances under which they are made,
not misleading, is liable to the person selling the security to him, who may
sue either at law or in equity for rescission or for damages if the buyer no
longer owns the security.

Id.

            In addition, the
TSA includes a definition of “sale:”

The terms “sale” or “offer for sale” or “sell” shall
include every disposition, or attempt to dispose of a security for value.  The
term “sale” means and includes contracts and agreements whereby securities are
sold, traded, or exchanged for money, property or other things of value, or any
transfer or agreement to transfer, in trust or otherwise.

See Tex. Rev. Civ.
Stat. Ann. art. 581-4(E) (West Supp. 2009) (emphasis added).  

            In Pitman v.
Lightfoot, a case involving similar facts, the San Antonio court of appeals
examined article 581-33(B).  Pitman v. Lightfoot, 937 S.W.2d 496 (Tex.
App.—San Antonio 1997, writ denied).  The Pitman court determined that
while the TSA does not define “offers to buy or buys,” the commentary to
article 581-33(B) “states that the provision is to be construed similarly to
article 581-33(A), which provides remedies for defrauded buyers of
securities.”  Id. at 531.  It then concluded that since “sale,” “offer
to sell,” and “sell” are so broadly defined, the terms “offer to buy” or “buy”
should “include every acquisition of, or attempt to acquire, a security for
value.”  Id.  It then noted that article 581-33(A) has been construed to
mean that the alleged misrepresentation must relate to the security and induce
the purchase of that security.  Id.  The San Antonio court of appeals
then held that, under article 581-33(B) of the TSA, the alleged untruth or
material omission must have related to the security and “induced the purchase
thereof.”  Id.  Finally, the court concluded that alleged omissions and
misrepresentations that occur only after the sale cannot be the “means” by
which a person “offers to buy or buys” the security.  Id. at 532.  

The Recap Agreements were signed on October 6, 2005. 
The alleged misrepresentations underlying appellants’ TSA claims against
Warrior occurred during the April 18, 2006 “Pricing Call” during which Raymond
James determined that the offering price for Warrior’s newly issued stock would
be $23.50 a share.  The evidence is undisputed that a few days after the
“Pricing Call,” the SPO was a great success and the amount ultimately paid to
appellants by Warrior as a result of the SPO far exceeded the $7.50 per share
minimum.  Based on that timeline of events, Warrior asserted it was entitled to
summary judgment because appellants had committed to sell their interests in
Warrior on October 6, 2005 and since the alleged misrepresentations occurred
after that date, they could not be the means by which a person offers to buy or
buys a security.  In response, appellants contend that since it was not known
until the “Pricing Call” that the offering price would meet the $7.50 per share
minimum price, they had not made a commitment to sell and the alleged
misrepresentations could still be the means by which a person offers to buy or
buys a security.[13]

Having examined the language of the Recap Agreements,
and considering that under article 581-33(B), “offer to buy” or “buy” includes
every acquisition of, attempt to acquire, or agreement to transfer, a security
for value, we hold that appellants, on October 6, 2005, contractually agreed to
sell all of their interest in Warrior at a price to be determined solely and
exclusively by Warrior, provided only that the price per share was at least
$7.50.[14]
 Pitman, 937 S.W.2d at 531.  Therefore, since the alleged
misrepresentations occurred after October 6, 2005, they could not be the
“means” by which Warrior offered to buy or bought appellants’ interests in
Warrior.  Pitman, 937 S.W.2d at 531.  We overrule appellants’ first
issue on appeal and affirm the trial court’s summary judgment on appellants’
TSA causes of action against Warrior.

III.      Did the trial
court err when it granted Simmons’ motion for summary judgment on appellants’
TSA claims?

            The TSA
establishes both “primary” and “secondary” liability for securities
violations.  Sterling Trust Co. v. Adderley, 168 S.W.3d 835, 839 (Tex.
2005).  “Primary” liability arises when a person offers to sell or buy a
security “by means of an untrue statement of a material fact or an omission to
state a material fact necessary in order to make the statements made, in the
light of the circumstances under which they are made, not misleading.”  Id. 
In contrast, secondary liability is derivative liability for another person’s
securities violation either because they are a “control person” or because they
“aided” the seller or buyer of the securities.  Id.

            Appellants
alleged that Simmons had both primary liability for its own alleged securities
violations as well as secondary liability for Warrior’s alleged securities
violations.  See Tex. Rev. Civ. Stat. Ann. art. 581-33(B) & (F).    Simmons
moved for summary judgment as to both, which the trial court granted on
specified grounds.

            A.        The
trial court correctly granted summary judgment on appellants’ primary liability
claims based on the timing of the alleged misrepresentations.

            Like Warrior,
Simmons argued it was entitled to summary judgment on appellants’ primary
liability claims because all of the alleged misrepresentations occurred after
appellants had made their investment decision by entering into the Recap
Agreements.  For the same reasons stated above in regard to appellants’ TSA
claims against Warrior, we overrule appellants’ second issue as it relates to
appellants’ primary liability claims against Simmons.

            B.        The
trial court correctly granted summary judgment on appellants’ secondary
liability claims against Simmons.

            Appellants also
asserted an article 581-33(F) secondary liability claim against Simmons.  “Secondary
liability is derivative liability for another person’s securities violation; it
can attach to either a control person, defined as ‘[a] person who directly or
indirectly controls a seller, buyer, or issuer of a security,’ or to an aider,
defined as one ‘who directly or indirectly with intent to deceive or defraud or
with reckless disregard for the truth or the law materially aids a seller,
buyer, or issuer of a security.’”  Sterling Trust Co., 168 S.W.3d at 839
(quoting Tex. Rev. Civ. Stat. Ann. art. 581-33(F)).  “Both control persons and
aiders are jointly and severally liable with the primary violator ‘to the same
extent as if [they] were’ the primary violator.”  Id.  Because secondary
liability is derivative liability for another person’s securities violation,
before a party, such as Simmons, can be held secondarily liable, there must
first be a primary violation.  Id.  As we have already determined there
has been no primary violation of the TSA because the alleged misrepresentations
underlying appellants’ TSA causes of action occurred after appellants had
committed to sell their entire interest in Warrior, we hold there can be no
secondary liability based on those same alleged misrepresentations.  We
overrule appellants’ second issue as it relates to appellants’ secondary
liability claims against Simmons.

IV.      Did the trial
court err when it granted Warrior’s motion for summary judgment on appellants’
breach of contract claims?

            According to
appellants, Warrior breached the Recap Agreements because it did not provide a
commercially reasonable SPO.  As part of their breach of contract cause of
action, appellants alleged that Warrior intentionally under-priced the stock
sold in the SPO in order to accomplish its allegedly unstated and undisclosed
motive of buying out all of appellants’ interests in Warrior.  Warrior moved
for summary judgment on these causes of action asserting two main arguments:
(1) Warrior’s goal of purchasing all of the appellants’ interest in Warrior was
expressly disclosed in the Recap Agreements; and (2) Warrior had no contractual
obligation to obtain, and appellants had no contractual right to demand, a
price greater than $7.50 per share.  The trial court agreed with Warrior and
granted its motion for summary judgment on that basis.  As a result, in their
third issue, appellants assert the trial court erred when it granted Warrior’s
motion for summary judgment on appellants’ breach of contract causes of action.[15]  We disagree.

              In the Recap
Agreements, appellants contractually agreed to convert all of their interest in
Warrior into shares of stock and then to sell all of those shares to Warrior,
provided that the price per share met the $7.50 minimum price.  In return,
Warrior agreed to use its commercially reasonable efforts to complete an
Underwritten Offering, a defined term in the Recap Agreements, which would
generate sufficient Net Proceeds, another term defined in the Recap Agreements,
that would then enable Warrior to “purchase not less than all” of appellants’
interest in Warrior.  In addition, the Recap Agreements granted Warrior the
sole and exclusive discretion to complete the Underwritten Offering at the
price and upon the terms offered by the underwriters.  Warrior’s discretion was
expressly subject to the $7.50 per share minimum price and was to be exercised
to enable Warrior to “purchase not less than all” of appellants’ shares of
Warrior stock unless the managing underwriter, not Warrior, determined that the
number of shares of Warrior stock to be sold in the Underwritten Offering
needed to be reduced.  Finally, appellants acknowledged in paragraph 6.5 of the
Recap Agreements that, among other things, they were sophisticated investors
and that the market value of Warrior’s stock might rise after the closing of
the Underwritten Offering and may exceed the price per share realized by
appellants as a result of the Underwritten Offering.  In other words, the Recap
Agreements envisioned two separate transactions: first, an Underwritten
Offering in which Warrior, through various underwriters, would sell newly
issued shares of stock.  The proceeds from this sale would then permit Warrior
to complete the second transaction: the “purchase of not less than all” of appellants’
Warrior stock at a price not less than $7.50 per share.

            It is also
important to note what the Recap Agreements do not contain.  First, they do not
contain any provision giving appellants the authority to rescind the deal if
the price per share achieved in the Underwritten Offering exceeded the $7.50
minimum but for some undisclosed reason was not satisfactory to appellants. 
The Recap Agreements also do not contain a provision requiring Warrior to
surrender their contractual right to “purchase not less than all” of
appellants’ interest in Warrior in order to obtain a higher price per share in
the Underwritten Offering.  Finally, the Recap Agreements do not have a
provision giving Warrior the authority to set the price per share in the
Underwritten Offering; instead, the Recap Agreements only authorize Warrior,
exercising its sole and exclusive discretion, to accept or reject the price per
share determined by the managing underwriter.

            We conclude
Warrior proved as a matter of law that it complied with its contractual
obligations.  Warrior hired Raymond James as the managing underwriter, provided
Raymond James and the other underwriters with all of the information they
requested, and participated in the Road Show to generate interest in the
Underwritten Offering.  Once Raymond James determined the price per share in
the Underwritten Offering would be $23.50, a price significantly higher than
the contractual minimum of $7.50, Warrior exercised its sole and exclusive
discretion to accept that price.  Warrior then completed the SPO and paid
appellants the net price per share, which appellants accepted.

We further conclude that appellants did not produce
summary judgment evidence raising a genuine issue of material fact.  Appellants
rely heavily on their argument that Warrior breached the Recap Agreements by
influencing Raymond James to set the price per share for the Underwritten
Offering at a commercially unreasonable low price to enable Warrior to
“accomplish its unstated and undisclosed motive of buying out all of the
[appellants] shares.”  Even if we were to assume Warrior had a contractual duty
to obtain a commercially reasonable price per share different from the $7.50
minimum specifically stated in the Recap Agreements, appellants’ argument still
fails because it flies in the face of the plain language of the Recap
Agreements which expressly disclosed Warrior’s goal of “purchasing not less
than all” of appellants’ ownership interests in Warrior.

In addition, appellants failed to introduce summary
judgment evidence creating a fact issue regarding whether Warrior played any
role in Raymond James’ decision to set the price per share at $23.50, or
whether Warrior even attempted to get Raymond James to set the price lower than
the aftermarket was willing to pay in order to acquire all of appellants’
ownership interest in Warrior.  Bonnie Bishop, the Raymond James employee
responsible for setting the offering price, testified that she decided there
was sufficient demand to set the offering price at $23.50 per share.  She
further testified that this price accomplished her objective of balancing the
interests of Warrior and potential investors with a price that ensured proper
aftermarket performance.  Bishop also testified unequivocally that she alone
determined the price offered to the Warrior pricing committee.  Bishop further
testified that a price higher than $23.50 was not appropriate as it could
adversely affect the “overall performance of the transaction,” especially the
“after market follow through that we needed to make sure it traded well.” 
Bishop also testified she did not believe that a higher price could have been
obtained if the number of shares included in the offering were reduced. 
Appellants offered no summary judgment evidence controverting Bishop’s
testimony.

Finally, again assuming Warrior had a contractual
duty to obtain a commercially reasonable price in the Underwritten Offering,
appellants contend they raised a genuine issue of material fact on their breach
of contract causes of action by citing to Charles Underbrink’s answers to a
line of questions during his deposition.  The initial question asked of
Underbrink was: “…in your experience would it be commercially reasonable for
the company to intentionally offer shares of the … company at a lower price in
order to take out a shareholder such as [appellants]?”  Underbrink responded:
“At a lower price—.”  This response was followed by the second question: “Than
it could normally get in an offering?” Underbrink answered: “That — it doesn’t
seem like a commercially reasonable thing to do.”  We conclude Underbrink’s
testimony is insufficient to raise a genuine issue of material fact on
appellants’ breach of contract cause of action.  This is so for several
reasons, including (1) it is based on the assumption that Warrior set the price
for the Underwritten Offering, which is not supported by the summary judgment
record; (2) it is based on the assumption that there was a higher price
acceptable to the underwriters than the price that was set, which is not
supported by the summary judgment record; and (3) the question does not take
into account the express purpose of the Recap Agreements: Warrior “purchasing
not less than all” of appellants’ interest in Warrior.

Because we conclude Warrior proved as a matter of law
that it complied with all of its contractual obligations and that appellants
did not produce summary judgment evidence raising a genuine issue of material
fact, we hold the trial court did not err in granting Warrior’s motion for
summary judgment on appellants’ breach of contract cause of action.  Therefore,
we overrule appellant’s third issue on appeal.

V.        Did the trial
court err when it granted appellees’ motions for summary judgment on
appellants’ statutory and common law fraud claims?

            Appellants also
asserted common-law and statutory fraud causes of action against both appellees
based on the same alleged misrepresentations discussed above.  A fraud cause of
action requires a party to establish that (1) a material misrepresentation was
made; (2) the representation was false; (3) when the speaker made the
representation he knew it was false or made it recklessly without knowledge of
the truth and as a positive assertion; (4) the speaker made it with the
intention that it should be acted upon by the party; (5) the party acted in
reliance upon it; and (6) the party thereby suffered injury.  Lundy v.
Masson, 260 S.W.3d 482, 492 (Tex. App.—Houston [14th Dist.] 2008, pet.
denied).  The elements of statutory fraud are nearly identical to the elements
of common-law fraud, except that statutory fraud under section 27.01 of the
Texas Business and Commerce Code does not require proof of knowledge or
recklessness as a prerequisite to recovery of actual damages.  See Tex.
Bus. & Com. Code Ann. § 27.01 (West 2009) (providing that a person who
makes a false representation commits fraud and is liable for actual damages
while a person who does so with actual awareness of the falsity of the
representation is liable to the person defrauded for exemplary damages). 
Therefore, reliance is an element common to both common-law and statutory fraud
causes of action.

            In their motions,
both appellees asserted they were entitled to summary judgment on appellants’
fraud claims because they proved as a matter of law that appellants did not
rely on any statement or omission attributable to either appellee.  The trial
court agreed and granted both motions.  In their fourth issue, appellants
challenge the trial court’s granting of appellees’ motions for summary judgment
on those claims.  For the same reasons stated above in sections II and III of
this opinion addressing appellants’ TSA causes of action, we conclude appellees
established as a matter of law that appellants could not have relied on the
alleged misrepresentations as they occurred after appellants had entered into
the Recap Agreements.  Therefore the trial court correctly granted appellees’
summary judgment on appellants’ common-law and statutory fraud causes of action. 
We overrule appellants’ fourth issue on appeal.

Conclusion

            Having overruled
each of appellants’ issues on appeal, we affirm the trial court’s final
judgment.

  

                                                                                                                                                                                                                                    /s/        John
S. Anderson

                                                                                    Justice

 

 

 

Panel consists of Justices Anderson, Brown, and Christopher.









[1] It was as a result of
Warrior’s efforts to merge with another entity that Simmons entered the scene. 
Simmons is an investment banking company with its base in Houston that
specializes in the area of petroleum businesses.  Warrior retained Simmons to
assist in the merger process.





[2] There was some dispute as
to whether this term is an accurate description of what Warrior agreed to do in
the Recap Agreements, however, since the parties all used this term we do so as
well.





[3] Warrior also agreed to
purchase all of Underbrink’s interest, however, Underbrink is not a party to
this appeal, in fact, he was a defendant in the underlying lawsuit.





[4] The actual process would
be as follows: the limited partnerships would convert their investment in
Warrior into shares of stock, which Warrior would then purchase for at least
$7.50 and would then retire.  None of the shares of stock owned by the limited
partnerships were sold in the SPO.





[5] “Holder” refers to the
specific limited partnership entering into the Recap Agreement with Warrior, in
the quoted language SJMB, however, the pertinent language in each Recap
Agreement is the same.





[6] “Company” refers to
Warrior.





[7] Raymond James.





[8] The $23.50 price was the
maximum price the stock could be sold for while still achieving the goal of
buying out all of the limited partnerships’ interest in Warrior.  Raymond James
determined this price.





[9] Tex. Rev. Civ. Stat. Ann.
art. 581-1 et seq (West Supp. 2009).





[10] Appellants use the term
“best deal” and “best price” interchangeably.





[11] Appellants do not appeal
the trial court’s summary judgment on their tortious interference with contract
claims and therefore they are not at issue in this appeal.





[12] The causes of action
against the remaining defendants ultimately went to trial and the jury found
against the plaintiffs and a take-nothing judgment was entered.





[13] Section 3.1 of the Recap
Agreements states: “Provided that the Net Price Per Share to be paid to the
[appellant] by [Warrior] at the Closing Time of the Underwritten Offering is
not less than [$7.50] per share …, [appellant] agrees to sell to [Warrior]
[appellant’s] Conversion Shares… out of the Net Proceeds of the Underwritten
Offering.”  Despite the fact that conditions precedent are disfavored and
courts will not construe a contract provision as a condition precedent unless
compelled to do so by language that may be construed no other way, we conclude
this language constitutes a condition precedent.  See Criswell v. European
Crossroads Shopping Ctr., 792 S.W.2d 945, 948 (Tex. 1992) (Terms such as “‘if,’
‘provided that,’ ‘on condition that,’ or some similar phrase of conditional
language must normally be included” to create a condition precedent).  A
condition precedent may be either a condition to the formation of a contract or
an obligation to perform an existing agreement.  Hohenberg Brothers Co. v.
George E. Gibbons & Co., 537 S.W.2d 1, 3 (Tex. 1976).  Conditions may,
therefore, relate to either the formation of contracts or to the liability
under them.  Id.  If a condition is a condition precedent to the
formation of a contract, then no binding contract will arise until the
specified condition has occurred or been performed.  Fred v. Ledlow, 309
S.W.2d 490, 491 (Tex. Civ. App.—San Antonio 1958, no writ); Continental
Transfer & Storage Co. v. Swann, 278 S.W.2d 413, 415 (Tex. Civ.
App.—Amarillo 1954, writ ref’d n.r.e.).  On the other hand, conditions
precedent to an obligation to perform are those acts or events which occur
subsequent to the making of a contract and which must occur before there is a
right to immediate performance and before there is a breach of a contractual
duty.  Hohenberg Brothers Co., 537 S.W.2d at 3.  If the condition is not
fulfilled, the contract or obligation attached to the condition cannot be
enforced.  CDI Engineering Group, Inc. v. Administrative Exchange, Inc.,
222 S.W.3d 544, 548 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).  In
essence, appellants assert that meeting the minimum price of $7.50 per share
constitutes a condition precedent to the formation of the Recap Agreements.  We
disagree with this assertion and instead conclude that the $7.50 minimum price
per share is a condition precedent to appellants’ existing contractual duty to
sell to Warrior all of their interests in Warrior and not a condition precedent
to the formation of the contracts.  See Roberts v. Clark, 188 S.W.3d
204, 210–11 (Tex. App.—Tyler 2002, pet. denied).  





[14] Our holding is
reinforced by cases construing federal securities laws.  See In re
ExxonMobil Corp. Sec. Litig., 500 F.3d 189, 200 n.14 (3d Cir. 2007)
(exchange of securities occurs not on the date they formally change hands, but
on the date the parties become committed to exchange the securities); Grondahl
v. Merritt & Harris, Inc., 964 F.2d 1290, 1291–94 (2d Cir. 1992) (the
date when the parties committed themselves to complete the sale was the date
they entered into two buy-sell agreements, though the stock was not valuated or
paid for until six years later); Helman v. Murry’s Steaks, Inc., 742
F.Supp. 860, 869–70 (D. Del. 1990) (“[O]nce the parties make the investment
decision and enter into a binding commitment to perform the transaction, the
purchase and sale is complete.”).





[15] The Recap Agreements
contain a choice of law provision stating they are governed by Delaware law. 
However, the parties, both in the trial court and here on appeal, all cite both
Texas and Delaware case law and indicate there is no conflict between the laws
of these two states.  If there is no conflict, then there is no need to resolve
a choice of law question.  In addition, no choice of law issue was presented by
either appellants or appellees in this appeal.  Therefore, we need not address
any choice of law issue.  See Young Refining Corp. v. Pennzoil Co., 46
S.W.3d 380, 385 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (finding no
necessity to decide which states’s law applied absent a conflict of law on the
issues presented).