Court of Appeals
Fourth Court of Appeals District of Texas
San Antonio



# MEMORANDUM OPINION

No. 04-11-00184-CV

Cynthia J. **MOAK**,
Appellant

v.

Cynthia **HUFF**,
Appellee

From the 37th Judicial District Court, Bexar County, Texas
Trial Court No. 2008-CI-21062
Honorable Janet P. Littlejohn, Judge Presiding

Opinion by:    Steven C. Hilbig, Justice

Sitting:    Karen Angelini, Justice
Sandee Bryan Marion, Justice
Steven C. Hilbig, Justice

Delivered and Filed:  February 15, 2012

AFFIRMED IN PART AND REVERSED AND REMANDED IN PART

The trial court rendered judgment awarding Cynthia Huff damages against her mother, Cynthia Moak, for violations of the Deceptive Trade Practices Act.  Moak appeals the judgment, arguing the evidence is legally and factually insufficient to support the trial court's findings and the trial court erred by failing to award her attorney's fees for successfully defending Huff's claim under the Texas Theft Liability Act.  We affirm the part of the judgment that awards Huff

damages under the DTPA. However, because we hold Moak was entitled to an award of attorney's fees, we reverse in part and remand the cause to the trial court for further proceedings.

## BACKGROUND

When Moak was married to Huff's father, Moak wrote a life insurance policy for him, naming herself as beneficiary. The couple later divorced, and during one of several child custody proceedings, the family court ordered that the beneficiary of the policy be changed from Moak to Huff. When Huff's father died in October 2006, Moak helped Huff obtain the $150,000 life insurance proceeds. In December 2006, Huff delivered $70,000 of the proceeds to Moak pursuant to an agreement between them that Moak would invest the money in real estate for Huff's benefit. According to Huff, Moak was to use her experience and expertise to invest the funds in real property that could be sold quickly for a profit, and in exchange, Moak would receive a share of the profit.

Two years after transferring the funds to her mother, Huff had not received any return on her investment or title to any property. When Moak refused Huff's demand to return the funds, Huff sued Moak, alleging multiple causes of action.

After a bench trial, the trial court ruled in Huff's favor on her DTPA, breach of contract, fraud, and conversion claims, and found that Moak committed the DTPA violations knowingly. The court found Huff suffered economic damages of $70,000, but that neither mental anguish damages nor entitlement to punitive damages was proven. The court ruled against Huff on her claim under the Texas Theft Liability Act (TTLA), ruling Huff did not prove criminal intent, and the court declined to impose a constructive trust on two properties Moak had purchased in her own name. Finally, the court denied Moak's claim for attorney's fees under the TTLA. Huff elected to recover on the DTPA cause of action, and the trial court signed a judgment awarding

Huff $70,000 in economic damages, prejudgment interest, $140,000 for knowing violations of the DTPA, post-judgment interest, and costs. At Moak's request, the trial court made findings of fact and conclusions of law.

On appeal, Moak challenges the legal and factual sufficiency of the evidence supporting the trial court's findings on various elements of each of the causes of action on which Huff prevailed. Additionally, Moak contends she conclusively established her attorney's fees and was entitled to recover them because she was the prevailing party in Huff's TTLA cause of action.

SUFFICIENCY OF THE EVIDENCE

*Standard of Review*

When the trial court has made findings of fact and a reporter's record has been filed, we review the findings for legal and factual sufficiency of the evidence using the same standards we apply to jury findings. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex. 1994); *Darocy v. Abildtrup*, 345 S.W.3d 129, 136 (Tex. App.—Dallas 2011, no pet.). In addressing a legal sufficiency challenge, we view the evidence in the light that supports the trial court's findings and indulge every reasonable inference that would support the findings. *City of Keller v. Wilson*, 168 S.W.3d 802, 827 (Tex. 2005). We credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless reasonable factfinders could not. *Id.* If the evidence "would enable reasonable and fair-minded people to reach the verdict under review" it is legally sufficient. *Id.* In reviewing factual sufficiency points, we look at all the evidence in the record, and will sustain the point only if the evidence supporting the trial court's finding is so weak or so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986); *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex. 1965). In conducting our review of both the legal and factual sufficiency of the evidence, we are mindful

that the trial court was the sole judge of the credibility of the witnesses and the weight to be given their testimony. *City of Keller*, 168 S.W.3d at 819. We may not substitute our judgment for the fact finder's, even if the evidence would clearly support a different result. *Maritime Overseas Corp. v. Ellis*, 971 S.W.2d 402, 407 (Tex.), *cert. denied*, 525 U.S. 1017 (1998).

### DTPA Claims and Findings

A consumer may recover the economic damages caused by his detrimental reliance on one of the false, misleading, or deceptive acts enumerated in section 17.46(b) of the DTPA. TEX. BUS. & COM. CODE ANN. §§17.46(b), 17.50(a)(1) (West 2011). If the trier of fact finds the conduct was committed knowingly, it may award additional damages. *Id.* §17.50(b)(1). Here, the trial court found Huff and Moak entered into an agreement whereby Huff gave Moak $70,000 to invest in real estate, with the intent the property would be sold quickly for a profit. The court found the parties agreed to split the profits. The court found Moak violated the DTPA by: (1) "represent[ing] her investment plan . . . had benefits or uses it did not have" and (2) "fail[ing] to disclose her intention of diverting one half of the life insurance proceeds to her own use[,] inducing Plaintiff into an investment plan that she probably would not have entered into if Defendant's plan had been disclosed." *See id.* §17.46(b)(15), (24). The court also found Moak's deceptive acts were committed knowingly and they caused Huff to suffer $70,000 in economic damages. The court found the parties had a long "history" and that their testimony about past events was contradictory. The trial court included a statement that its findings were based on its evaluation of the witnesses' credibility.

Moak challenges the sufficiency of the evidence to support the findings that Huff was a consumer of Moak's services, that Moak made any misrepresentations about the investment plan

- 4 -

or failed to disclose her true intentions about her use of the funds, and that any conduct violating the DTPA was committed knowingly.

### *The Evidence*

The only witnesses at trial were Huff, Moak, and Moak's attorney, who testified only about attorney's fees. Both Huff and Moak testified their relationship had been strained for a long time. According to Huff, her mother approached her after her father died and offered to help her obtain the life insurance proceeds. Huff believed her mother was making an effort to rebuild their relationship, and accepted the offer. Huff received $150,000 insurance proceeds in the beginning of December 2006. Huff testified that her mother urged her to invest as much of the proceeds as possible and offered to invest the funds for her. Huff testified she had wanted to use the money to buy a house for her and her young son to live in, but Moak talked her out of it. Huff had no experience with or knowledge about investing, but knew her mother had run an investment consulting business. She testified she had several discussions with Moak about investing the funds, during which Moak told Huff she had broad expertise in different fields of investing, including real estate. Huff testified Moak explained the concept of "flipping" real estate to her, and told her that in order to make a profit, one must buy and sell quickly in order to keep expenses low. She testified Moak also explained to her that investment agents customarily take a percentage of the profit.

Huff decided to give her mother about half of the insurance proceeds to invest for her. Huff testified Moak told her she would most likely invest the money in real estate, led her to believe she would "flip" the property, and told Huff that "we" should get a good return. Based on what Moak explained to her about "flipping" real estate, Huff understood this to mean the intent was to sell the property quickly. Huff testified it was also her understanding from her

discussions with her mother that, as the investment agent, Moak would get a percentage of the profits. However, they never discussed exactly how much Moak would make.

Moak's account of the discussions was different. Moak testified that her daughter only talks to her when she needs help with something, and that it was Huff who approached her for help getting the insurance proceeds. Moak testified that Huff also came to her asking for help investing the proceeds. According to Moak, Huff was concerned she was spending the proceeds too quickly. Moak testified that Huff came to her and asked her to invest the money. According to Moak, Huff suggested it be invested in real estate, and that was the only type of investment they ever discussed. Moak denied Huff ever said she wanted to use the proceeds to buy a house for her and her son.

Moak testified she is a business consultant and operated a sole proprietorship called "Financial Resources and Investments" since Huff was a child. Moak denied telling Huff she had any experience investing in real estate. Moak is not a licensed real estate agent or mortgage broker and never has been. The only license she has ever held is an insurance agent license. In December 2006, Moak's only experience buying or selling real estate was in hiring a realtor to buy a personal home. Moak was not familiar with the San Antonio real estate market at that time. Moak testified she attended her first sheriff's sale at the beginning of December 2006, about the same time Huff received the insurance proceeds. She did this because she was curious about the procedure and was interested in buying tax sale property for herself.

Moak testified that during her discussions with Huff, Moak believed the San Antonio real estate market was very healthy and that if Moak could buy property at a good price, "it would be a good situation" for Huff. Moak testified she agreed to research and buy property with Huff's money, maintain and sell the property for Huff's benefit, and disburse any profits to Huff when

the property sold.  Moak testified they did not discuss any time frame for selling the property.  Moak also testified she was not going to receive any compensation for her efforts.

On December 18, 2006, Huff gave Moak $70,000.  Moak transferred the funds to an account in her business name — "Cynthia Moak, Sole Proprietor, Financial Resources and Investments."  Moak testified the account was to be used solely for Huff's investment.  However, Moak conceded the funds in that account were comingled with Moak's personal funds, and she testified she did not take any steps to distinguish her funds from Huff's.

After receiving the money from Huff, Moak consulted with a realtor who advised her about the San Antonio market.  Moak testified she decided the only way to buy at a reasonable price was at a sheriff's sale.  Moak purchased two properties at a sheriff's sale on February 7, 2007.  One of the properties was 2.004 acres of unimproved land on Seguin Road, which was purchased for $24,800.  Moak testified the comparables for this property were between $150,000 and $399,000.  She also bought a house on Schmeltzer Street for $60,400.  Moak believed that property was worth over $100,000.  Moak testified she used her own funds to pay for the difference in the price of the properties, but considered the properties to be Huff's.  The deeds were put in Moak's name, individually.  Moak stated this was because she owned the properties, would be managing them, and was going to rehabilitate them.  She testified she believed she had to own the properties in order to turn on the utilities and authorize work to be done.

Moak testified she did not consult with Huff about purchasing properties at a tax sale, about what properties to buy, or about how much to spend to purchase the properties or to prepare them for sale.  Nor did Moak tell Huff she was putting the properties in her own name or the reason for doing so. Moak testified she notified Huff about the purchases when they

occurred. However, she conceded she stopped communicating with Huff about a month later because they entered into a "rather unpleasant" custody dispute over Huff's son.

Huff denied that Moak told her about the tax sale purchases. She testified she tried to contact her mother on numerous occasions, was unable to get any information from Moak about her investment. According to Huff, she first learned about the properties in July 2007, when the judge in the custody proceeding over Huff's son ordered Moak to provide Huff information about her investment. Moak then gave Huff copies of the deeds from the February 2007 tax sale and a "Statement of Account." The statement recited that 40% of Huff's investment ($28,000) was in the Schmeltzer property, and that 60% of Huff's investment ($42,000) was in the Seguin Road property. However, the Seguin Road property only cost $24,800, and the statement recites that "[p]reparation of property for sale not yet begun." And Moak admitted the total cost associated with that property was less than $42,000.

Huff testified that after she learned about the properties in July 2007, she told Moak she wanted the properties sold quickly so she could get her money back. Moak's response was "you're not the only investor involved in this. It's not all about you." Huff testified that in the only other conversation she had with her mother about the investment, Moak told her she would return Huff's money if Huff would "sign over the rights" to her son. Moak did nothing further to inform Huff about anything done to prepare, list, advertise, rent, or sell the properties.

*The Schmeltzer Street property*

Moak testified she did an on-site visit to the Schmeltzer property before bidding on it, but did not notice there were squatters living in the house. After buying the property, she pursued a forcible entry and detainer action to remove them. Moak testified she spent money to remodel the house, but it was burglarized and vandalized several times and the work had to be redone.

Much of the labor was done by her father-in-law's construction company, which received thousands of dollars for the work. Moak testified the cost of the work was lower than if she had used another contractor.

Moak testified she first listed the Schmeltzer property for sale in the fall of 2007. She did not hire a real estate agent and testified she was advertising and showing the house herself in order to keep expenses down. She rented the house to tenants for several months and testified she used the proceeds towards maintenance of the property.

In February 2008, Moak mortgaged the Schmeltzer property. Although the property appraised for $124,000 at the time, the mortgage company would only give her a loan for $86,500, 70% of the value. Moak signed a deed of trust and a thirty-year note at seven and one-half percent interest. Moak testified she used the net proceeds of $76,000 for her daily living expenses.

In April 2009 Moak decided to aggressively advertise and market the property, and she hired a real estate agent. The house was listed at $129,500 at that time, but at the time of trial in December 2010, the asking price had been reduced to $124,000.

Moak testified she never consulted with or advised Huff about any of the work done on the Schmeltzer property, her decision to mortgage the Schmeltzer property, or how to use the mortgage proceeds. It "never occurred" to her to do so. Likewise, it "never occurred" to Moak to consult with Huff about her decision to rent the Schmeltzer house for several months or to keep the proceeds from the rentals. Huff did not learn the property had been rented until this litigation.

### *The Seguin Road property*

Moak offered no evidence she had ever listed the 2.004 acre Seguin Road property for sale. Huff testified that at one point, after she learned the properties had been bought, Moak told her she had received an offer for it, but turned it down because it was too low. The property was purchased for $24,800, and Moak's records show no expenses other than property taxes were incurred on the property through 2009. Moak testified that when she bought the property, she had comparables valued at between $150,000 to $399,000. There is no evidence the property needed any work and Moak offered no explanation of why she did not seek a quick sale of the property in 2007 or early 2008. Moak testified that in late summer 2008, the property lost much of its value because new FEMA floodplain maps put part of the land in the one-hundred-year flood plain. The Bexar County Appraisal District appraised the property at $99,500 in 2007, but the appraisal had dropped to $58,490 by 2009.

Moak stated she did not have a planned time frame for selling the Seguin Road property and never set up a budget for marketing of the property. She denied ever telling Huff she had turned down an offer on the property. Moak testified the only offer she received was a walk-in offer for $70,000 in October 2008. The prospective buyers submitted a signed earnest money contract, but according to Moak, the offer was withdrawn because the buyers could not obtain financing.

Moak testified that although she commingled Huff's funds with her own, she kept records of the expenses associated with each property. She testified that as of the time of trial, she had spent more than $86,800 of her own funds to purchase, rehabilitate, and maintain the properties. The expenditures are reflected in her "Quick Book" entries that were admitted into evidence. Moak testified both properties were for sale at the time of trial, but the economic downturn, the

increased difficulty in qualifying for a mortgage, and the flood plain designation made sale difficult. Moak stated that when the properties sell, she plans to subtract her expenses from the proceeds and give Huff the balance.

### *Consumer Status*

Moak argues Huff was not a consumer under the DTPA because Moak's investment services were being provided gratuitously. A consumer under the DTPA is one who "sought or acquired by purchase or lease." TEX. BUS. & COM. CODE ANN. § 17.45(4) (West 2011). To be a "consumer," the plaintiff must have sought or acquired goods or services by purchase or lease, and those goods and services must be the basis of the complaint. *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex. 1981). "A gratuitous act is not a purchased good or service under the Act." *Moritz v. Bueche*, 980 S.W.2d 849, 855 (Tex. App.—San Antonio 1998, no pet.).

Moak contends she provided her investment service gratuitously, and the evidence was insufficient to support the trial court's finding that the parties agreed Moak would receive part of the profits from the investment as payment for her services. We disagree. Huff testified that before she entered into the investment agreement with her mother, Moak explained to her that the investment agent, Moak in this case, generally takes a share of the profits on the investment. Moak told Huff "we" should make a good return, and Huff understood her mother would share the profits from the investment. Huff agreed to this arrangement. Although Moak testified she was not going to receive any compensation for her services, the trial court was free to disbelieve her and to believe Huff instead. Further, although the property had not been sold for a profit at the time of trial, Moak received monetary benefits from her investment services. For example, Moak received $76,000 from the equity in the Schmeltzer property, which she used for personal

expenses. Further, it was apparent from the court-ordered accounting Moak prepared in July 2007 that $17,200 of Huff's funds had not been attributed to either of the properties. These funds were commingled with Moak's personal funds in an account Moak used for her personal expenses. We hold the evidence is both legally and factually sufficient to establish that Huff sought or acquired Moak's services by purchase or lease and was therefore a consumer under the DTPA. *See E.F. Hutton & Co., Inc. v. Youngblood*, 708 S.W.2d 865, 868-69 (Tex. App.—Corpus Christi 1986), *aff'd*, 741 S.W.2d 363 (Tex. 1987) (holding plaintiff was a consumer of investment services for which commission was to be paid even though no commission was ultimately paid or charged).

### *Knowing DTPA violations*

The trial court found Moak knowingly[1] violated the DTPA by (1) representing her investment plan for Huff had benefits or uses that it did not have and (2) failing to disclose her intent to divert the funds to her own use, thus inducing Huff into an investment plan she probably would not have entered into had Moak's plan been disclosed. The trial court's findings do not specify what Moak's misrepresentations were, and Moak did not request additional findings. Moak argues the evidence is legally and factually insufficient to support these findings.

Moak argues the evidence of any statements she made to Huff about the investment plan is insufficiently specific to constitute actionable misrepresentations or was mere "puffing" or opinion. However, Moak does not address Huff's contention that part of the inducement for her to give the money to Moak were Moak's representations that she had broad investment expertise, including in real estate. Moak fostered the impression that she had experience in real estate investment by explaining to Huff how real estate could be "flipped" for a profit. Huff was led to

---

[1] "Knowingly" under the DTPA means "actual awareness of, at the time of the act or practice complained of, of the falsity, deception, or unfairness of the act or practice giving rise to the plaintiff's claim." TEX. BUS. & COM. CODE ANN. § 17.45(9) (West 2011).

believe Moak would use her "broad expertise" to make profitable investment decisions. Moak, in fact, had no knowledge of the real estate market in San Antonio, had never been a real estate agent or mortgage broker, and had never purchased or sold any property other than her personal residence. She consulted with a realtor about the San Antonio market *after* receiving Huff's money and a year later she took a two-day real estate course. Given that Moak conceded at trial that she had no experience investing in real estate, the trial court could reasonably find that Moak knowingly misrepresented her qualifications and expertise.

Huff also argued Moak misrepresented that she intended to quickly sell the property she bought and failed to disclose that she instead intended to divert the funds for her own benefit. Moak contends the only direct evidence of her intent at the time of the transfer of funds was her own testimony that it was her intent to buy real estate, prepare it for sale, and sell it for a profit, all of which she would give to Huff. She argues her testimony was clear, direct, positive, and free from contradiction or suspicious circumstances, and that the trial court was therefore not free to disregard it. *See Schwartz v. Pinnacle Communications*, 944 S.W.2d 427, 435 (Tex. App.—Houston [14th Dist.] 1997, no writ). Moak argues that the circumstantial evidence of her intent at the time of the agreement is "consistent with either of two facts and nothing shows that one is more probable than the other," and therefore "neither fact can be inferred." *See Lozano v. Lozano*, 52 S.W.3d 141, 148 (Tex. 2001) (holding jury may not reasonably infer ultimate fact from meager circumstantial evidence; where circumstantial evidence is slight, something else must be found in record to corroborate probability of fact's existence). She also argues that the trial court could not rely on Moak's conduct after the purchase as evidence of her intent at the time Huff gave her the money. We disagree.

"Intent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434 (Tex. 1986). "While a party's intent is determined at the time the party made the representation, it may be inferred from the party's subsequent acts after the representation is made." *Id.* Although Moak testified to her pure intent, there was ample circumstantial evidence that she intended to use the funds for her own benefit and did not intend to sell the property quickly for a profit.

The evidence regarding the Seguin Road property supports a finding that Moak did not intend to resell the property quickly. By Moak's own testimony, the Seguin Road property was bought at 25% or less of its February 2007 value. There was no evidence the property needed any work to prepare it for resale in February 2007, and the only expense Moak attributed to the property was for taxes. Yet Moak did not prepare a marketing plan or timeline for the property, did not list it for sale, and took no other action to try to sell it.

The circumstantial evidence also supports the trial court's finding that Moak intended to use Huff's funds for her own benefit. Initially, Moak talked Huff out of buying a house to live in with her son, and instead encouraged Huff to invest the funds in real estate through Moak. From the time Moak received the funds, she treated them as if they were her own. Moak put the money in an account where it was commingled with Moak's personal funds; an account from which Moak paid personal expenses. After buying the property at the tax sale, Moak had the deeds put in her name, individually, where they remained at the time of trial. The only tangible evidence that Moak acknowledged Huff had any interest in the property was the July 2007 court-ordered report, which lists Huff's investment in the Seguin Road property at an amount higher than the total cost and expenses associated with the property. Moak did not consult with Huff

about any decisions regarding the properties, did not advise Huff that insurance claims were made and paid on the Schmeltzer property, and did not advise Huff the property was being rented or share any of the proceeds with Huff. Most significantly, Moak mortgaged the Schmeltzer property for $86,000, and used the proceeds to pay her living expenses. That it "never occurred" to Moak to consult with Huff about her decision to mortgage the property is entirely consistent with and supports a finding that Moak intended to use the funds for her own benefit from the beginning.

The circumstantial evidence supporting the trial court's findings is considerably more than "meager." *See Lozano*, 52 S.W.3d at 148. A reasonable factfinder could have found the weight of the circumstances made it more probable that Moak's intent was to divert Huff's funds for her own benefit and that she did not intend to sell the property quickly. *See id.* at 148-50. The trial court, as the sole judge of the witnesses' credibility, was free to disbelieve Moak's testimony about her intent. In light of the record as a whole, we hold the evidence supporting the trial court's findings is not contrary to the overwhelming weight of the evidence or so weak as to be clearly wrong and unjust. *See Cain*, 709 S.W.2d at 176.

We hold the evidence is both legally and factually sufficient to support the trial court's findings that Moak knowingly misrepresented her qualifications and expertise and her intent to sell the property quickly for a profit and knowingly failed to disclose her intent to divert the funds for her own use and benefit. We affirm the judgment for Huff on her DTPA claim. We therefore do not address Moak's issues challenging the findings in support of the breach of contract, conversion, and fraud claims.

**ATTORNEY'S FEES**

Moak next argues the trial court erred by failing to award her attorney's fees because she was the prevailing party on Huff's TTLA claim and she conclusively established the amount of her fees. Chapter 134 of the Civil Practice and Remedies Code is the Texas Theft Liability Act. Section 134.005(b) of that chapter states:

> Each person who prevails in a suit under this chapter shall be awarded court costs and reasonable and necessary attorney's fees.

TEX. CIV. PRAC. & REM. CODE ANN. art. 134.005(b) (West 2011).

Moak presented evidence at trial that the reasonable and necessary fees and costs she had incurred through trial were $43,600 and the fees that would be incurred in an appeal to this court were $7,000. She also presented evidence that it would cost $5,000 to respond to a petition for review in the Supreme Court and $12,000 if the petition were granted. Huff did not controvert this evidence. Additionally, Moak's fee witness testified in one conclusory statement that the fees incurred defending the TTLA claim could not be segregated because the "causes of actions are . . . inextricably intertwined with each other." The trial court ruled for Moak on Huff's TTLA claim, concluding Moak "did not exhibit the requisite criminal intent for [Huff] to recover under the Theft Liability Act." However, the court also concluded that Moak "is not entitled to recover attorney fees pursuant to the Theft Liability Act as a prevailing party." The trial court did not make any findings of fact about the amount of reasonable and necessary fees Moak incurred defending the claim.

### *Entitlement to Fees*

The availability of attorney's fees under a particular statute is a question of law for the court. *Holland v. Wal–Mart Stores, Inc.*, 1 S.W.3d 91, 94 (Tex. 1999). We therefore review the issue *de novo*. *El Paso Nat. Gas Co. v. Minco Oil & Gas, Inc.*, 8 S.W.3d 309, 312 (Tex. 1999);

*Travel Music of San Antonio, Inc. v. Douglas*, No. 04-07-00757-CV, 2002 WL 1058527, at *3 (Tex. App.—San Antonio May 29, 2002, pet. denied) (not designated for publication).

The award of fees to a prevailing party in a TTLA action is mandatory. *Peoples v. Genco Fed. Credit Union*, No. 10-09-00032-CV, 2010 WL 1797266, at *7 (Tex. App.—Waco May 5, 2010, no pet.)(mem. op.) (affirming summary judgment for defendant in a TTLA suit and remanding for fee award). The TTLA requires the court to award attorney's fees to a prevailing defendant "without any prerequisite that the claim is found to be groundless, frivolous, or brought in bad faith." *Air Routing Int'l Corp. (Canada) v. Britannia Airways, Ltd.*, 150 S.W.3d 682, 686 (Tex. App.—Houston [14th Dist.] 2004, no pet.); *see Bocquet v. Herring*, 972 S.W.2d 19, 20 (Tex. 1998) ("Statutes providing that a party 'may recover,' 'shall be awarded,' or 'is entitled to' attorney fees are not discretionary."). The TTLA claim must actually be litigated for either party to be entitled to fees. *See Travel Music*, 2002 WL 1058527, at *3 (holding that where TTLA claim was nonsuited before trial, no party successfully prosecuted or defended merits of TTLA claim; therefore neither party "prevailed" on claim so as to be entitled to fee award, even though related claims were tried). A plaintiff who obtains both a liability finding and relief, i.e., damages, on the TTLA claim is entitled to an award of fees. *Glattly v. Air Starter Components, Inc.*, 332 S.W.3d 620, 641-42 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). A defendant who successfully defends a TTLA suit is entitled to recover his fees. *See Peoples*, 2010 WL 1797266, at *7; *Air Routing*, 150 S.W.3d at 684.

Huff argues this case is distinguishable from *Air Routing* and *Peoples* because in each of those cases the defendant obtained a take-nothing judgment against the plaintiff in the suit as a whole and, was clearly the prevailing party in the suit. She argues that a person does not "prevail in a suit" unless he is the "party in whose favor a judgment is rendered" and is "vindicated by the

judgment." *See Flagship Hotel, Ltd. v. City of Galveston*, 117 S.W.3d 552, 564-5 (Tex. App.—Texarkana 2003, pet. denied) (where each party prevailed on various breach of contract claims in suit, "prevailing party" for purpose of fee award was party who prevailed on main issue, was awarded damages, and "was vindicated by the trial court's judgment"); *City of Amarillo v. Glick*, 991 S.W.2d 14, 17 (Tex. App.—Amarillo 1997, pet. dism'd) (police officers who appealed Civil Service Commission decision were entitled to fee award under 143.015(c) Texas Local Government Code as prevailing parties because officers were "vindicated by the judgment," which set aside Commission's decision, even though officers did not receive all relief sought).

None of the cases cited by either Moak or Huff involve a party who clearly prevailed on claim for which fees are statutorily authorized, but who was unsuccessful on other claims and had a monetary judgment rendered against him. And none of the cases cited by either party sheds light on the precise issue before us: whether the phrase "person who prevails in a suit under this chapter" requires the party seeking fees simply to prevail on the TTLA claim or to prevail in the suit as a whole. *See McKinley v. Drozd*, 685 S.W.2d 7, 8-9 (Tex. 1985) (noting that language of DTPA that "[e]ach consumer who prevails shall be awarded . . ." did not answer question whether consumer must prevail only on DTPA claim or must obtain net recovery in entire lawsuit, and holding that, in light of purpose of statute, "prevail" referred to claim under DTPA and net recovery in suit not required for fee award).

When we construe a statute, we read the words and phrases used in context, and we construe them according to the rules of grammar and common usage. TEX. GOV'T CODE ANN. § 311.011(a) (West 2005). Huff focuses on the word "suit," and argues the statute means that to be entitled to a recovery of fees under the TTLA, a party must prevail on the TTLA cause of action in a suit *and* prevail in the suit as a whole. However, this interpretation adds a

requirement to the recovery of fees that the legislature did not include in the statute. We believe the more common sense meaning of the phrase "suit under this chapter" is a cause of action under chapter 134 of the Texas Civil Practice and Remedies Code — the TTLA. We hold that a person who prevails in a TTLA cause of action is entitled to recover the reasonable fees necessarily incurred prosecuting or defending that cause of action, even if the party is unsuccessful on other claims and counterclaims litigated in the same suit. We therefore conclude the trial court erred in ruling that Moak was not entitled to recover attorneys' fees under the TTLA as a prevailing party.

### *Amount of Fees*

Moak challenges the legal and factual sufficiency of the trial court's failure to find any fees. To prevail on her legal sufficiency point, Moak must show there was no evidence to support the trial court's failure to award any fees and that the evidence establishes the amount of her reasonable and necessary fees as a matter of law. *See Dow Chem. Co. v. Francis*, 46 S.W.3d 227, 241 (Tex. 2001). Moak contends she conclusively established reasonable and necessary attorney's fees in the amount of $43,600. She argues she also presented uncontroverted evidence that the causes of action were so inextricably intertwined that fees could not be segregated, and that the trial court was therefore not free to disregard it.

A party who prevails on a cause of action for which fees are recoverable must prove the fees that were necessary for the litigation of that claim. "[A] prevailing party must segregate recoverable from unrecoverable attorney's fees in all cases." *Varner v. Cardenas*, 218 S.W.3d 68, 69 (Tex. 2007) (citing *Tony Gullo Motors I, L.P v. Chapa*, 212 S.W.3d 299, 313 (Tex. 2006)). In *Tony Gullo*, the Texas Supreme Court "reestablished the rule that attorney's fees are recoverable only if necessary to recover on a contract or statutory claim allowing them, and

eliminated the exception for fees incurred solely on separate but arguably intertwined claims." *Varner*, 218 S.W.3d at 69 (citing *Tony Gullo*, 212 S.W.3d at 313). The limited exception to the duty to segregate applies only "when discrete legal services advance both a recoverable and unrecoverable claim." *Tony Gullo*, 212 S.W.3d at 313-14. The party seeking fees bears the burden of demonstrating the exception applies. *Id.* at 314; *Thomas v. Goodman*, No. 04-07-00531-CV, 2008 WL 2602120, at *4 (Tex. App.—San Antonio July 2, 2008, pet. denied) (mem. op.). "If any of the component tasks relate solely to a cause of action for which legal fees are not recoverable, the claimant must segregate the fees." *7979 Airport Garage, L.L.C. v. Dollar Rent A Car Sys., Inc.*, 245 S.W.3d 488, 509 (Tex. App.—Houston [14th Dist.] 2007, pet. denied).

Moak's attorney testified about the time spent defending Huff's claims and that the amount of fees claimed were reasonable and necessary to the defense. When asked whether he could segregate the fees incurred defending the TTLA claim from those relating to the other causes of action, the witness testified:

> They can't be segregated. The causes of actions are, I believe the case law says, inextricably intertwined with each other. So you're not able to separate them out.

However, Moak also introduced into evidence her attorney's billing records, which include entries for legal work unrelated to defense of the TTLA claim. For example, one entry reflects three hours spent drafting a DTPA counterclaim. Another reflects over three hours to research a "trust issue." These fees were clearly not necessarily incurred in the defense of the TTLA claim. Because the discrete legal services performed by Moak's attorneys did not all advance both the defense of the TTLA claim and the defense of the other causes of action, Moak was required to segregate her attorney's fees. *See Tony Gullo*, 212 S.W.3d at 314 ("when "it cannot be denied that at least some of the attorney's fees are attributable only to claims for which fees are not recoverable," segregation is required); *See also Ragsdale v. Progressive Voters League*, 801

S.W.2d 880, 881-82 (Tex. 1990)(the trial court is not required to credit uncontroverted testimony where circumstances tend to discredit or impeach the testimony).

We hold Moak was required to segregate her attorney's fees, but did not do so. Therefore, Moak did not conclusively establish the amount of her fees and is not entitled to have judgment rendered in her favor for the full amount of fees she sought. However, because Moak is entitled to recover the reasonable and necessary attorney's fees incurred in defending the TTLA claim and because "unsegregated attorney's fees for the entire case are some evidence of what the segregated amount should be," *Tony Gullo*, 212 S.W.3d at 314, we reverse the judgment in part and remand the cause to the trial court for a new trial on Moak's attorney's fees.

## CONCLUSION

We affirm the judgment in favor of Huff on her DTPA claim. However, because the trial court erred in failing to award Moak the fees incurred successfully defending the TTLA claim, we reverse the judgment in part and remand the cause to the trial court for a new trial on Moak's attorney's fees.

Steven C. Hilbig, Justice